THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY WINSTON, Defendant-Appellant.
First District (1st Division)   No. 1—87—1984

Opinion filed November 27, 1989.

Randolph N. Stone, Public Defender, of Chicago (Paul D. Bellendir and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, James E. Fitzgerald, and Laura M. Suffield, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Larry Winston, was charged with two counts of murder, one count of armed violence and one count of concealment of a homicidal death. Following a bench trial, defendant was found not guilty of murder by reason of insanity and not guilty of armed violence and concealment of a homicide. The trial court imposed an 80-year period of commitment on defendant, who now brings this appeal. The following issues are raised on appeal.

(1) Whether the trial court's determination that defendant's offense was brutal and heinous after finding defendant not guilty of murder by reason of insanity was legally inconsistent and barred by collateral estoppel; (2) whether application of the extended-term statute to section 5—2—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—4(b)), which regulates proceedings after acquittal by reason of insanity, violates due process; (3) whether the trial court's finding that defendant's offense was brutal and heinous, warranting imposition of an extended term, constituted a violation of the eighth amendment prohibition against cruel and unusual punishment (U.S. Const., amend. VIII); (4) whether the State proved by clear and convincing evidence that the defendant was in need of inpatient rather than outpatient treatment.

The following testimony was presented at trial. The State presented Chicago police officer Louis Skylis, who testified that on October 1, 1985, he responded to a call at 306 West 111th Street. He was met at the doorway by Willie Smith, who told him that defendant had killed Leonard Rhodes and that the body was in the basement. The officer proceeded downstairs to a laundry utility room, where he observed the victim's body wrapped in a blanket placed across the top of a washing machine and drier. After the officer returned upstairs and advised defendant of his rights, the defendant admitted that he had killed the victim and then showed the officer the butcher knife which he had used in the murder. Officer Skylis placed defendant under arrest and noticed that defendant's hands were wrapped in gauze bandages that had some blood on them. Defendant informed Officer Skylis that his hands had been cut in the fight. The officer also observed that there were blood spots on the walls between the kitchen and the living room and that some of the spots appeared smeared or wiped off. Officer Skylis identified a picture of the laundry-utility room depicting the victim's body lying across the top of the washer and drier with the victim's head hanging down into the laundry tub.

The State then presented Chicago police officer John Paladino. In addition to corroborating the testimony of Officer Skylis, he testified

that the victim's limbs had been severed at the shoulder and that he had opened a plastic bag located near the washer and drier and discovered that the bag contained the victim's severed arms and hands.

Dr. Robert Kirchner testified by way of stipulation regarding the multiple stab wounds and post-mortem dismemberment of arms and partial decapitation. Following the State's evidence, defendant moved for a directed finding of not guilty. The trial court reserved ruling on the motion.

Defendant called Thomas Gambino, who testified that he is an investigator employed by the public defender's office. Gambino photographed defendant, at which time he observed that defendant's left arm was in a sling and cast, his left palm was scarred and his right palm was scarred and marked near the base of his first finger.

Defendant next called Detective Frank Glynn, who testified that after defendant was advised of his *Miranda* rights, defendant told him that he had gone to his niece's house in the morning and met with Leonard Rhodes, the victim. Earlier that day, defendant's niece had had a baby, and Rhodes was the father of the baby. After defendant and Rhodes had a conversation, defendant told Detective Glynn that Rhodes "went off." Defendant walked to the front door and was about to leave when Rhodes pushed him. After defendant turned around and punched Rhodes in the face or chest, Rhodes ran toward the kitchen and returned with a knife. In an attempt to defend himself, defendant wrestled the knife away from Rhodes and stabbed him many times. Defendant told Officer Glynn that he chased Rhodes through the house and stabbed him in the back and on the sides and that he then hid Rhodes' body in the basement.

Ollie Winston, defendant's brother, testified that on October 1, 1985, shortly after 11:30 a.m., he received a phone call from defendant, who requested that he stop by his sister's house on his way to work. When Ollie arrived at his sister's house, defendant answered the door. Defendant then told Ollie that he and Rhodes had been talking when Rhodes suddenly jumped up and "went off" on him. Upon questioning, defendant told Ollie that he didn't know if Rhodes was all right. Winston further testified that defendant rarely participated in family functions because he had a phobia regarding crowds, including the family.

Lillie Smith, defendant's sister, testified that on October 1, 1985, her daughter gave birth to a baby fathered by Leonard Rhodes. When she returned home from the hospital, defendant answered the door. Defendant showed Lillie his hands and explained that he had killed Rhodes and that the body was downstairs. After Lillie's husband

checked the basement and confirmed that Rhodes was dead, Lillie contacted the police while defendant sat on the couch.

Detective Paladino testified that defendant subsequently gave a statement to him that detailed the events of October 1, 1985. Defendant stated that when he offered congratulations to Rhodes on the birth of the baby, Rhodes developed "an attitude" and "went off" on defendant. Defendant attempted to leave the house, but Rhodes pushed him into the door. Defendant then turned around and punched Rhodes, after which Rhodes ran into the kitchen and returned with a knife. Following a struggle, Rhodes dropped the knife and ran back toward the kitchen. Defendant assumed Rhodes was going to get another knife, so he picked up the first knife, chased Rhodes and stabbed him many times. Rhodes ran downstairs to his basement bedroom and fell across the bed. Although defendant's recollection was hazy, he realized that he was standing over Rhodes and that Rhodes was dead. Defendant stated that he guessed he moved Rhodes' body onto the washer and drier, although he did not remember. After making certain changes in his written statement, defendant refused to sign it.

Drs. Karen Smith, Matthew Markos and Albert Stipes also testified on behalf of defendant. Each doctor found defendant to be legally insane and unable to conform his conduct to the requirements of the law at the time he committed the murder. Dr. Markos further found defendant unable to appreciate the criminality of his acts due to a psychotic disorder, while Drs. Smith and Stipes did not form an opinion as to whether defendant could appreciate the criminality of his acts.

In rebuttal, the State presented Dr. Gerson Kaplan, who testified that defendant could appreciate the criminality of his acts, that he could conform his conduct to the requirements of the law and that he was legally sane at the time he committed the murder.

At the conclusion of the evidence, the trial court found defendant not guilty of murder by reason of insanity and not guilty of armed violence and concealing a homicide. Pursuant to the trial court's order, defendant remained as an inpatient while the Department of Mental Health prepared its report.

On March 17, 1987, a commitment hearing was held. The State presented Dr. Susan Nowak, a psychiatrist licensed to practice in Illinois. Dr. Nowak testified that she had interviewed defendant on four separate occasions, from December 1986 through January 1987, each interview lasting approximately 1½ hours. She also had interviewed defendant's mother, sister and brother for approximately two hours in

January 1987 and had reviewed the relevant police reports, evaluations conducted by three different psychiatrists on seven different occasions and the results of the psychological testing performed by a fourth doctor. After consideration of this information, Dr. Nowak determined that defendant has had psychological difficulties since the early 1970s. These difficulties were demonstrated by his behavior, which included an unusual use of alcohol, including drinking at work, and an episode with amphetamines in an attempt to control his eating. This behavior also reflected defendant's preoccupation with morbid obesity. She also concluded that defendant suffers from a number of phobic symptoms and anxiety attacks.

On cross-examination, Dr. Nowak testified that although she did not presently diagnose any major depression, psychotic disorder or organic disorder, she found defendant to have severe psychological problems. Dr. Nowak testified extensively regarding defendant's response to stress, including his rigidity with respect to responsibility and his difficulties in dealing with his family. She concluded that he was dangerous to himself and to others and that he was in need of inpatient treatment. Dr. Nowak also testified that she believed it was a possibility that defendant would commit suicide.

The trial court imposed a maximum 80-year period of commitment on defendant based upon defendant's brutal and heinous conduct. Defendant now brings this appeal.

Defendant argues that his acquittal on grounds of insanity was legally inconsistent with the trial court's subsequent finding that the offense was accompanied by brutal and heinous conduct indicative of wanton cruelty. He contends that because the court determined that he was insane at the time the offense was committed, the court is collaterally estopped from finding that he exercised brutal and heinous conduct when he killed Rhodes. Defendant argues that wanton cruelty requires the conscious infliction of pain on another for the sadistic enjoyment of it (see, *e.g.*, *People v. Jones* (1979), 73 Ill. App. 3d 99, 103, 391 N.E.2d 767), whereas an act committed by one who is insane is an involuntary act. (*People v. Clark* (1981), 102 Ill. App. 3d 414, 417, 429 N.E.2d 1255.) As the insanity defense exculpates a person with impaired volition (*People v. Grant* (1978), 71 Ill. 2d 551, 558, 377 N.E.2d 4), an involuntary act cannot be indicative of wanton cruelty, which by definition requires conscious conduct. Defendant maintains that a finding of wanton cruelty, therefore, is barred by collateral estoppel. Relying on *People v. Thomas* (1988), 168 Ill. App. 3d 113, 522 N.E.2d 253, the State claims that a trial court's determination that a defendant was legally insane at the time of the offense is not

legally inconsistent with the trial court's application of an extended term based on defendant's brutal and heinous conduct in committing the offense and, therefore, the finding of wanton cruelty is not barred by collateral estoppel.

■ Collateral estoppel is embodied in the fifth amendment guarantee against double jeopardy. (*Ashe v. Swenson* (1970), 397 U.S. 436, 444-45, 25 L. Ed. 2d 469, 476, 90 S. Ct. 1189, 1195.) Under the doctrine of collateral estoppel, when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in a future lawsuit. *People v. Frias* (1983), 99 Ill. 2d 193, 202, 457 N.E.2d 1233.

■ ■ The Unified Code of Corrections requires that admission into custody of the Department of Mental Health and Developmental Disabilities of a defendant acquitted of a felony by reason of insanity shall be for an indefinite period of time. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—2—4(b).) The maximum period of commitment for a person acquitted by reason of insanity may not exceed the maximum length of time that the defendant would have been required to serve had he been convicted and received the maximum sentence for the most serious crime under section 5—8—1 of the Code. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1.) Illinois law, however, provides that a judge may extend the sentence of an offender to a term of imprisonment in excess of the maximum sentence that section 5—8—1 authorizes if the judge finds that any of the factors in aggravation are present. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2.) One of the factors in aggravation is whether the offense was accompanied by "exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).) Where there is a finding of aggravation under this section, the term of imprisonment may be extended to be not less than 40 and not more than 80 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2.) In *People v. Thomas* (1988), 168 Ill. App. 3d 113, 522 N.E.2d 253, the court held that application of the extended term based upon brutal and heinous behavior is determined, not by defendant's state of mind, but rather by the nature of the offense. *Thomas*, 168 Ill. App. 3d at 123.

The defendant in *Thomas* was found not guilty by reason of insanity of beating the victim to death with a baseball bat following an argument over a haircut. After the acquittal, the trial court imposed an extended-term sentence based upon the defendant's brutal and heinous conduct in committing the offense. On appeal, defendant advanced essentially the same argument that is before this court: whether the trial court was collaterally estopped from making a find-

ing of wanton cruelty once the court had found the defendant lacked the state of mind to support a finding of guilty. As noted above, the court held that application of the extended-term statute is determined by the offense rather than by the extent or nature of the defendant's participation. *Thomas,* 168 Ill. App. 3d at 123; see also *People v. Larson* (1985), 132 Ill. App. 3d 594, 598, 478 N.E.2d 439; *People v. Clay* (1984), 124 Ill. App. 3d 140, 154, 463 N.E.2d 929; *People v. Cox* (1983), 113 Ill. App. 3d 136, 138-39, 446 N.E.2d 1280.

The court in *Thomas* noted that there is no correlation between the seriousness of an offense and the length of time necessary for recovery; an insanity acquittee's confinement is based solely upon his continuing illness and the danger he poses to the community. (*Thomas,* 168 Ill. App. 3d at 121, citing *Jones v. United States* (1983), 463 U.S. 354, 368-69, 77 L. Ed. 2d 694, 708, 103 S. Ct. 3043, 3051-52; see also *People v. Williams* (1986), 140 Ill. App. 3d 216, 228, 488 N.E.2d 649.) In the case at bar, consistent with *Thomas,* the trial court applied the extended-term sentence based on the nature of the offense rather than on the defendant's state of mind. The trial court properly considered the intensity of the attack and the violence of the subsequent mutilation of the victim in determining that an extended-term sentence was warranted.

■ *People v. Grayson* (1974), 58 Ill. 2d 260, 319 N.E.2d 43, cited by defendant in support of his contention that collateral estoppel is applicable here, is distinguishable. The defendant in *Grayson* was tried for his participation in a robbery committed while he was on probation. After his acquittal, the State instituted proceedings to revoke defendant's probation based on the robbery charges. On appeal, the court held that the ultimate fact of identity had been determined by a final judgment at trial and therefore the State was collaterally estopped from relitigating that issue in a probation revocation proceeding regardless of the different standards of proof. (*Grayson,* 58 Ill. 2d at 265.) In the instant case, the issue of defendant's state of mind was not relitigated at his commitment hearing, and he therefore was not subjected to double jeopardy.

Defendant also relies on *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, in support of the argument that the defendant's state of mind at the time of the offense is a relevant factor in computing an extended-term sentence. The defendant in *Evans* was charged with murder and sentenced to an extended term when a stray bullet from his gun killed an unintended victim. The supreme court affirmed the appellate court's ruling that the voluntary manslaughter offense was not accompanied by exceptionally brutal or heinous behavior indicative

of wanton cruelty. (*Evans*, 87 Ill. 2d at 87.) While the court considered the defendant's state of mind toward the intended victim, it did not focus on the defendant's state of mind with regard to the actual victim. Moreover, as the court in *Thomas* pointed out, the defendant in *Evans* was not an insanity acquittee, and therefore, "[s]ociety's interest in being protected from the dangerous propensities of an insane acquittee who is prematurely released from confinement" was not at issue. *Thomas*, 168 Ill. App. 3d at 125.

Defendant next contends that the trial court's imposition of the extended-term statute to a commitment period violates due process and is contrary to the sentencing scheme intended by the legislature. He maintains that the 80-year extended term imposed not only violates the automatic commitment formula set out in section 5—2—4(b) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—4(b)), but also the plain language of the extended-term provision of section 5—5—3.2 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2). Defendant urges that consistent with section 5—8—1 (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1), which provides that murder is punishable for a term of not less than 20 years and not more than 40 years, this court should reduce the time of defendant's commitment from 80 years to 40 years, less credit for good behavior. Defendant maintains that the extended-term provisions were never intended by the legislature to be applied to commitment sentences and cites *People v. Spudic* (1986), 144 Ill. App. 3d 1071, 495 N.E. 2d 616, as authority that the Unified Code of Corrections does not "permit a trial court to extend a period of commitment beyond the maximum term set by reference to subsection (b) of the statute." *Spudic*, 144 Ill. App. 3d at 1075.

Commitment following an acquittal by reason of insanity is addressed in section 5—2—4(b) of the Unified Code of Corrections, which provides in relevant part:

"[T]he initial order for admission of a defendant acquitted of a felony by reason of insanity shall be for an indefinite period of time. Such period of commitment shall not exceed the maximum length of time that the defendant would have been required to serve, less credit for good behavior, before becoming eligible for release had he been convicted of and received the maximum sentence for the most serious crime for which he has been acquitted by reason of insanity." Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—4(b).

Under the existing sentencing scheme, the Unified Code of Corrections provides:

"(1) for murder, (a) a term shall be not less than 20 years and not more than 40 years ***." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1.

The extended-term statute is set out in section 5—8—2 of the Code. It provides:

"(a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present. Where the judge finds that such factors were present, he may sentence an offender to the following:

(1) for murder, a term shall be not less than 40 years and not more than 80 years ***." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2.

The use of the term "maximum sentence" in section 5—2—4(b) contemplates that a trial court must refer to the existing sentencing scheme in order to determine the sanction that could be imposed, an issue we addressed in *People v. Larson* (1985), 132 Ill. App. 3d 594, 478 N.E.2d 439. Although there is no history of the extended-term statute specifically reflecting the legislative intent that the statute be applicable to commitments under section 5—2—4(b), as we noted in *Larson*, neither is there anything in the plain language of section 5—2—4(b) indicating that the words "maximum sentence" were intended to be limited by the 40-year maximum sentence provisions of section 5—8—1 of the Unified Code of Corrections. Our view here, as in *Larson*, is that had the legislature intended to impose such a limitation, the statute would have included express language setting forth the limitation. (*Larson*, 132 Ill. App. 3d at 597.) When read in conjunction with the extended-term statute, we think it is clear that the maximum time defendant could be required to serve is 80 years.

*People v. Spudic* (1986), 144 Ill. App. 3d 1071, 495 N.E.2d 616, which defendant relies upon to support his contention that the maximum sentence is limited by the provisions of section 5—8—1, is distinguishable. The defendant in *Spudic* was found not guilty of felony theft by reason of insanity. He was sentenced to the maximum five-year commitment period, less credit for good behavior. After a three-year period of commitment, defendant filed a motion for discharge which was denied. While the parties agreed that with credit for good behavior, the maximum term of incarceration would have been 2½ years, the trial court refused to discharge defendant based on its finding that defendant still required mental health services. The appellate

court reversed the denial of the petition for discharge on the basis that the defendant had already been confined in excess of the maximum length of time permitted under the Uniform Code of Corrections, but went on to note that if the maximum term had been reached and the acquittee had not recovered from his mental illness, he still would be subject to "civil" commitment under the terms of the Mental Health and Developmental Disabilities Code. (*Spudic,* 144 Ill. App. 3d at 1075-76.) Here, however, the defendant is asking this court to determine the meaning of the statutory language "maximum length of time," not to determine whether the maximum term had been exceeded.

■■ Defendant's contention that a "conviction" is a necessary prerequisite to applying the extended-term provision has no merit. The plain language of section 5—2—4(b) states that a commitment period shall not exceed the maximum length of time that the defendant would have been required to serve had he been convicted. Thus the language of the extended-term provision calling for a "conviction" automatically embodies commitment proceedings without specific reference.

Defendant next contends that the trial court's imposition of the extended-term statute to a commitment sentence violates due process. The State's response is that the application of the extended-term statute to criminal commitment periods is not violative of due process as its application reasonably balances and protects the interests of society and the insanity acquittee.

■■ When determining whether a statute violates due process, we must determine whether the statute is reasonably designed to remedy evils which the legislature has determined to be a threat to the public health, safety and general welfare. (*People v. Bradley* (1980), 79 Ill. 2d 410, 417, 403 N.E.2d 1029.) The due process clause requires only that a statute be reasonably designed to accomplish its purpose, not that it be the best means of accomplishing it. *Bell v. Wolfish* (1979), 441 U.S. 520, 542-43, 60 L. Ed. 2d 447, 470-71, 99 S. Ct. 1861, 1875-76; *People v. Burton* (1981), 100 Ill. App. 3d 1021, 1023, 427 N.E.2d 625.

■■ ■ The primary objective of section 5—2—4 is to insure that insanity acquittees are not indeterminately institutionalized while at the same time protecting society from the premature release of mentally ill persons who have been proved capable of dangerous acts. (*Larson,* 132 Ill. App. 3d at 600.) Application of the extended-term statute is not inconsistent with this objective. Initially, application of the extended-term statute to section 5—2—4(b) furthers the State's in-

terest by allowing the courts to consider the dangerousness of the acquittee's acts in setting his maximum commitment period. It also provides for a potentially longer period in which the court can monitor the treatment being rendered to a defendant and review any decision to release him.

In addition, utilization of the extended-term statute protects the acquittee from the threat of indeterminate commitment because it provides for a maximum sentence which automatically sets a definite outer limit to defendant's commitment period. Defendant is protected from unjustified institutionalization by provisions requiring periodic review of his condition by mental health professionals and release if he regains his sanity and is no longer dangerous to himself or society. Accordingly, discretionary imposition of the extended-term statute in setting the maximum period of criminal commitment reasonably balances and protects the interests of society and those of the insanity acquittee, and thus, does not violate due process.

Defendant also maintains that the imposition of an extended sentence in the instant case constitutes a violation of the eighth amendment of the United States Constitution and article I, section 11, of the Illinois Constitution's prohibitions against cruel and unusual punishment in that it is punishment in disguise and disproportional. Defendant argues that the imposition of the extended-term sentencing statute not only fails to serve a treatment rationale but is equivalent to making it a criminal offense for a person to be mentally ill, in contravention of *Robinson v. California* (1962), 370 U.S. 660, 667, 8 L. Ed. 2d 758, 763, 82 S. Ct. 1417, 1420-21. He urges that the ruling in *Robinson*, that a criminal penalty cannot be inflicted on the basis of mere status, is applicable here.

Under Illinois law, the fact that the maximum period of criminal commitment is determined by reference to the extended-term statute does not mean that a defendant's commitment period constitutes a "sentence" or "punishment." (See, *e.g.*, *People v. Thomas* (1988), 168 Ill. App. 3d 113, 522 N.E.2d 253; *People v. Larson* (1985), 132 Ill. App. 3d 594, 478 N.E.2d 439.) In *Larson* we found that the application of the extended-term statute to an insanity acquittee does not constitute punishment, as the purpose of the criminal commitment is treatment of the mental illness, and the length of the confinement is limited to the time necessary for recovery. We also focused on the fact that application of the extended-term statute does not negate the rehabilitative focus of criminal commitment, as the defendant is still committed for an indefinite period and may be released any time he is found to have regained sanity. (*Larson*, 132 Ill. App. 3d at 598.) In

light of *Larson,* we reject defendant's contention that application of the extended-term statute constitutes cruel and unusual punishment. Defendant's reliance on *Robinson v. California* is also misplaced. While the Court in *Robinson* held that merely being a narcotics addict would not be a criminal offense, the Court recognized that a State could impose some form of compulsory treatment, including involuntary confinement. *Robinson,* 370 U.S. at 665, 8 L. Ed. 2d at 763, 82 S. Ct. at 1420.

■■■ With respect to the question of disproportionality of an extended-term sentence as applied to insanity acquittees, defendant cites *Solem v. Helm* (1983), 463 U.S. 277, 290-91, 77 L. Ed. 2d 637, 649-50, 103 S. Ct. 3001, 3010, which requires a reviewing court to consider:

"(1) the gravity of the offense and the harshness of the penalty;

(2) a comparison of sentences imposed on other criminals in the same jurisdiction; and

(3) a comparison of sentences imposed in other jurisdictions."

Although defendant concedes that the "gravity of the offense" is not relevant here based upon the acquittal, he urges this court to address the harshness of the penalty, which is relevant to the rehabilitative goals of the mental health system. As noted previously, defendant mistakenly equates the defendant's commitment period with a sentence based upon conviction, which it is not. As the court stated in *People v. Thomas* (1988), 168 Ill. App. 3d 113, 119-20, 522 N.E.2d 253, the commitment period is not a penalty. It is based upon the defendant's continuing illness and perceived dangerousness. Defendant's comparisons between the commitment order here and sentences imposed upon other criminals in the same jurisdiction are not well founded in that the cases cited deal with convictions and sentences rather than insanity acquittals.

The final issue raised by defendant is that the State failed to prove by clear and convincing evidence that he was in need of inpatient rather than outpatient treatment. He contends that Dr. Nowak's testimony was contradictory and her opinion was based upon speculation. He notes that she admitted on cross-examination that he did not suffer from any major psychotic or major organic disorders, that he had admitted his rage, which was a significant step in treatment, that he had demonstrated control over his former alcohol and drug problems and that his behavior in the hospital was admirable. Defendant further points out that his treatment involved primarily counseling

and that Dr. Nowak had admitted that he was responsible and would probably follow through on any treatment. The State maintains that Dr. Nowak's testimony clearly established that defendant is potentially dangerous to himself and to others.

Under Illinois law, the State bears the burden of proving that the defendant must remain in custody for involuntary inpatient mental treatment by clear and convincing evidence. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—2—4(g); *In re Stephenson* (1977), 67 Ill. 2d 544, 559, 367 N.E.2d 1273.) This evidence must derive from a current evaluation of the defendant's conduct and state of mind, including medical evidence that he presents a danger to himself or others as a direct result of the mental disorder. (*People v. Butler* (1979), 69 Ill. App. 3d 556, 559, 387 N.E.2d 908.) While any finding as to dangerousness must be based upon a specific medical opinion regarding the defendant's possible future conduct rather than merely upon a finding of mental illness (*People v. Czyz* (1980), 92 Ill. App. 3d 21, 26-27, 416 N.E.2d 1), it need not be predicated upon an expectation of immediate danger. *People v. Sanchez* (1984), 126 Ill. App. 3d 746, 751-52, 467 N.E.2d 1085.

Here the State produced a qualified expert, and the defendant had an opportunity to cross-examine Dr. Nowak for the purpose of bringing forth any factors in favor of outpatient care. The doctor's testimony addressed not only past behavior but her conclusion that the underlying cause of defendant's stress still exists and that lack of control could potentially be triggered by factors outside of defendant's control if he is not under inpatient care. Dr. Nowak's opinions were supported by substantial explanation in the record regarding defendant's suppression of rage and his inability to cope with specific kinds of stress. We believe that Dr. Nowak's testimony satisfied the requirements of section 5—2—4(a)(1)(B) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—4(a)(1)(B)), with respect to the issue of defendant's need for inpatient rather than outpatient care.

In view of the foregoing, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

MANNING, P.J., and CAMPBELL, J., concur.