THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL BRYANT, Defendant-Appellant.

First District (4th Division) No. 1—87—1822

Opinion filed August 16, 1990.

Michael J. Pelletier and Thomas Long, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Michael Bryant, and codefendant Donald Elam were convicted of murder, attempted murder, armed robbery, home invasion, and resi-

dential burglary.[1] Bryant was sentenced to 80 years' imprisonment for the murder conviction; 30 years' imprisonment for the attempted murder, armed robbery, and home invasion convictions; and 15 years' imprisonment for the residential burglary conviction. The 15- and 30-year terms were to run concurrently with each other, but consecutive to the 80-year term. On appeal, defendant raises the following issues for review: (1) his fifth amendment right to the assistance of counsel was violated when the trial court admitted into evidence uncounseled, incriminating statements which were elicited after he had invoked his right to counsel; (2) defendant was denied a fair trial when the trial court improperly admitted evidence of other charges against defendant, which were not material to the pending case and which may have led the jury to believe he had a propensity to commit crimes; (3) defendant was denied a fair trial where the trial court summarily rejected the jury's request for a copy of the transcript of the complaining witness' testimony, and the court refused the jury's request to define "abet"; and (4) the trial court used the wrong standard to evaluate defendant's objection to the State's use of its peremptory challenges. Defendant also claims that the extended-term sentencing structure under which the court sentenced him is unconstitutionally vague.

We affirm.

BACKGROUND

Lee Cavanaugh testified that he was sitting in the kitchen of his apartment when his wife, Imogene, returned home from work at approximately 6 p.m. on the evening of February 7, 1986. Cavanaugh recalled that when his wife entered the apartment, she was accompanied by a man (later identified as Donald Elam) who was holding a knife to her throat. Cavanaugh also recollected that his wife's hands were handcuffed behind her back. Several minutes later, another man (later identified as defendant) entered the Cavanaughs' apartment. Defendant was also carrying a knife. Shortly after defendant entered the apartment, he began to stab Cavanaugh, who then grabbed a knife from the kitchen to defend himself. While Cavanaugh and defendant were "cutting at each other," Elam told Cavanaugh that he would slit his wife's throat if Cavanaugh did not surrender. Cavanaugh surrendered and gave his knife to the intruders.

Elam and defendant tied Cavanaugh's hands behind his back.

---

[1] Prior to trial, the trial court granted the defendants' joint motion to sever. Separate jury trials were thereafter held for each defendant.

They laid Cavanaugh on the front room floor next to his wife. Elam and defendant then searched the apartment for money and valuables.

Next, Elam and defendant took Cavanaugh into the couple's bedroom. They tied Cavanaugh's feet together with a belt and stabbed him 10 to 15 times in the chest and back before leaving the room. A short time later, Cavanaugh was able to loosen the belt around his feet, and he began kicking the floor. His attackers returned to the bedroom and stabbed Cavanaugh repeatedly around the throat.

Shortly thereafter, the assailants left the apartment. When Cavanaugh realized that Elam and defendant had departed, he dragged himself up from the floor. Cavanaugh went to the front hall and kicked his neighbor's front door. The neighbor's child opened the door, and Cavanaugh asked him to call the police and fire department. Cavanaugh was subsequently taken to the hospital, where he remained for "three to four months."

Chicago police officer Phillip Kelly testified that on February 7, 1986, he and his partner, Alfred Schultz, were dispatched to the Cavanaughs' apartment to investigate the report of "a man bleeding." Kelly testified that the Cavanaughs' apartment had been ransacked and was splattered with blood. Kelly found Imogene Cavanaugh lying on the bedroom floor in a pool of blood. She was wearing her winter coat, her hands were handcuffed behind her back, and she was unconscious. After the paramedics removed Imogene Cavanaugh's coat, the police officers noticed that a butcher knife was protruding from her rectum.

Assistant Cook County Medical Examiner Dr. Tae An testified that her post-mortem examination of Imogene Cavanaugh revealed two stab wounds. Dr. An noted that Imogene Cavanaugh had been stabbed underneath the chin and in the rectum. Dr. An concluded that Mrs. Cavanaugh had died from stab wounds which had lacerated her carotid artery, rectum, and vagina.

Everett Andre Smith testified that on February 12, 1986, at approximately 10:20 p.m., defendant, defendant's sister, and Elam came to his home. At this time, Elam was carrying a stereo receiver. After some discussion, Smith gave $40 for the stereo receiver. Approximately three hours later, defendant and Elam returned to Smith's home. At that time, defendant and Elam asked Smith if he wanted to buy some watches, diamond earrings, and a pistol. Smith declined to purchase these items. Earlier during the trial, Lee Cavanaugh had identified the stereo receiver and the watches as his property.

Chicago police detective Patrick Mokry testified that on March 19, 1986, he and several other police officers conducted a lineup at Little

Company of Mary Hospital so that Lee Cavanaugh could view and possibly identify the offenders who had invaded his home. Mokry recalled that after Cavanaugh viewed the lineup for the second time, he identified Elam and defendant as the offenders.

Chicago police detective Barry Costello testified that on February 13, 1986, he arrested defendant in connection with an unrelated armed robbery and aggravated battery. Costello also served defendant with a warrant on an unrelated burglary.

Chicago police detective Stephen Brownfield testified that on March 19, 1986, he picked up defendant from Cook County jail pursuant to a court order and transported him to Area Two Police Headquarters for questioning on the instant offense.

Assistant State's Attorney McNerney testified that on March 19, 1986, he was participating in the investigation relating to Imogene Cavanaugh's murder. McNerney spoke to the police officers who were investigating the Cavanaugh murder and reviewed their reports of the incident. Later that afternoon, McNerney had two separate discussions with defendant. During the first discussion, defendant informed McNerney that he was hungry and thirsty. Defendant was then given some food and a soda. Later that afternoon, at approximately 4 p.m., McNerney returned to question defendant about his involvement in the Cavanaugh murder. Before McNerney questioned defendant, he read him his *Miranda* rights. McNerney thereafter obtained a statement from defendant which was recorded and transcribed by a court reporter.

Defendant's statement set forth his role in the attack on the Cavanaughs. Before trial, defendant moved to suppress this confession on the grounds that the police violated his fifth amendment right to have counsel present during the custodial interrogation in which he inculpated himself. The trial court denied defendant's motion to suppress, and defendant's statement was read into the record at trial.

During questioning, defendant stated that he and Elam followed Mrs. Cavanaugh home from the bus stop on the evening of February 7, 1986, because they wanted to "snatch her purse." Defendant recalled that when they arrived at the vestibule of the Cavanaughs' apartment building, Elam handcuffed Mrs. Cavanaugh. Elam and defendant then accompanied Mrs. Cavanaugh into her apartment, where Lee Cavanaugh was waiting for her to return home from work. The intruders tied Cavanaugh's hands behind his back with a telephone cord. Elam and defendant then ransacked the apartment in their search for money and valuables.

Later, Elam and defendant took the Cavanaughs into separate

rooms. Elam directed defendant to stab Cavanaugh. The defendant stabbed Cavanaugh in the side, and then Elam stabbed Cavanaugh with a butcher knife. After Elam bagged some of the Cavanaughs' valuables, the pair left the apartment. Later that evening, Elam told defendant that he had had sex with Mrs. Cavanaugh and then stabbed and killed her and her husband.

OPINION

I

In order to address defendant's fifth amendment argument, we first set forth the facts relevant to the resolution of this issue. The record discloses that on February 13, 1986, defendant was arrested and charged with armed robbery and aggravated battery. Later that day, the court appointed counsel to represent defendant on those charges. On March 19, 1986, Detective Brownfield picked up defendant from Cook County jail, where he was being held on the armed robbery and aggravated battery charges, and transported defendant to Area Two Police Headquarters to be interrogated about the murder of Imogene Cavanaugh. After Assistant State's Attorney McNerney twice advised defendant of his *Miranda* rights, defendant gave both an oral and a court-reported statement that implicated him in the instant offense. These are the statements which defendant now seeks to suppress.

Defendant maintains that he invoked his fifth amendment right to counsel when he accepted counsel at the time formal proceedings were initiated on the armed robbery and aggravated battery charges. Defendant claims that his invocation of his fifth amendment right to counsel remained in effect while he was custodially interrogated about the Cavanaugh murder. Defendant therefore reasons that his fifth amendment right to counsel was violated when the police questioned him about the Cavanaugh murder outside of the presence of his previously appointed attorney.

In response, the State maintains that defendant's statements inculpating him in the instant offense were not obtained in violation of his fifth amendment right to counsel merely because defendant was in custody at the time on an unrelated charge and had retained counsel to defend him on the first set of charges.

■ The fifth amendment guarantees that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." (U.S. Const., amend. V.) The fifth amendment protection against compelled self-incrimination provides the right to counsel at custodial in-

terrogations. *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.

In *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, the Supreme Court implemented a rule to ensure the integrity of the fifth amendment:

> "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 16 L. Ed. 2d at 706, 86 S. Ct. at 1612.

The *Miranda* Court further noted that if the accused indicates "at any stage of the process that he wishes to consult with an attorney before speaking[,] there can be no questioning." (*Miranda v. Arizona*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.) In implementing this rule, the Court was concerned that some confessions might not be procured voluntarily, but, rather, through "interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice." *Miranda v. Arizona*, 384 U.S. at 464-65, 16 L. Ed. 2d at 718, 86 S. Ct. at 1622-23.

Defendant cites several cases to support his claim that his fifth amendment right to counsel was violated when the State interrogated him about the Cavanaugh murder outside of the presence of his previously appointed counsel. Defendant relies, in part, on *Arizona v. Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093, to support his contention that his fifth amendment right to counsel was violated because he had already requested the assistance of counsel with respect to the first set of charges when he was custodially interrogated about the Cavanaugh murder.

In *Roberson*, the defendant was arrested for burglary. A police officer advised the defendant of his *Miranda* rights. In response, the defendant informed the police officer that he wanted to speak to an attorney before he answered any questions. Although the arresting officer noted this fact in his written report of the incident, the defendant was not given an opportunity to consult with an attorney. Three days after the initial interrogation, and while the defendant was still in custody, another police officer advised the defendant of his *Miranda* rights and questioned him about an unrelated burglary. The second police officer was unaware that the defendant had requested an opportunity to speak with counsel when he was questioned about the first burglary charge. During this second interrogation, the

defendant made an incriminating statement about the second burglary which he later sought to have suppressed.

■ The Supreme Court determined that the defendant's incriminating statement was obtained in violation of his fifth amendment right to counsel. The Court held that the rule enunciated in *Edwards v. Arizona* precluded the authorities from interrogating an accused following the accused's request for counsel in the context of a separate investigation. (*Roberson*, 486 U.S. at 682, 100 L. Ed. 2d at 714, 108 S. Ct. at 2098.) The Court specifically noted that "the presumption raised by a suspect's request for counsel—that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Arizona v. Roberson*, 486 U.S. at 683, 100 L. Ed. 2d at 715, 108 S. Ct. at 2099.

*Arizona v. Roberson* is distinguishable from the case at bar in at least one important respect. After the police officer advised Roberson of his *Miranda* rights, Roberson declined to answer any questions before he met with an attorney. However, before an attorney was appointed to represent Roberson, the second police officer again advised Roberson of his *Miranda* rights, reinterrogated him, and obtained from him the incriminating statement which he later sought to have suppressed. Here, in contrast, the defendant was not only advised of his right to counsel with respect to the first set of charges—he requested, and obtained, counsel to represent him at the proceedings relating to this first set of charges. Later, when defendant was questioned about the Cavanaugh murder while still in custody on the first charges, he was again advised of his *Miranda* rights. However, defendant then waived these rights, answered the questions posed to him, and thereafter incriminated himself.

■ The instant record clearly indicates that defendant did not request that his previously appointed attorney be present while he was being interrogated about the Cavanaugh murder. Further, the record does not indicate that the police pressured or "badgered" defendant into confessing that he was involved in the Cavanaugh murder. We therefore reject the defendant's argument that *Arizona v. Roberson* is dispositive of his fifth amendment claim.

■ The defendant also relies on *United States ex rel. Espinoza v. Fairman* (7th Cir. 1987), 813 F.2d 117. Specifically, defendant argues that by requesting and accepting the representation of counsel on the unrelated charges, he invoked both his fifth amendment right to counsel, which applies to custodial interrogations, and his sixth amend-

ment right to counsel, which attaches once formal criminal proceedings are initiated.[2]

In *Espinoza*, the accused was arrested on a weapons charge. He was subsequently represented by counsel at the arraignment on this charge. While the defendant was in custody on the weapons charge, police officers advised him of his *Miranda* rights and thereafter questioned him about a murder. The defendant was not represented by counsel at this interrogation, during which he confessed to the murder.

The Seventh Circuit determined that the defendant's confession to the murder was inadmissible because he had earlier invoked his fifth amendment right to counsel; that the invocation remained in effect because the custodial interrogation occurred while the defendant remained in continuous police custody; and that because the State initiated the interrogation, the defendant was incapable of waiving his right to counsel. *Espinoza*, 813 F.2d at 122.

■■ We note that the *Espinoza* decision conflicts with the Illinois Supreme Court's decision in *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.[3] In *Martin*, the defendant was arrested and was taken into custody on a rape charge. A public defender was appointed to represent the defendant on that charge. While the defendant was still in custody on the rape charge, he was taken from one part of the jail to another for questioning on an unrelated murder charge. At first, the defendant stated that he did not know anything about the murder. Later, the defendant admitted that he had participated in the murder. Following this oral statement, the assistant State's Attorney assigned to the case read the defendant his *Miranda* rights, questioned the

---

[2]The sixth amendment right to counsel attaches when judicial proceedings have been initiated against the accused, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. (*Brewer v. Williams* (1977), 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, 97 S. Ct. 1232, 1239.) Unlike the fifth amendment right to counsel, the sixth amendment right is limited to charges on which judicial proceedings have been initiated. The right has not been extended to provide counsel during questioning on unrelated charges. (*United States v. Gouveia* (1984), 467 U.S. 180, 81 L. Ed. 2d 146, 104 S. Ct. 2292; *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877.) Therefore, defendant's argument that his previously invoked sixth amendment right to counsel extends to the custodial interrogation on the Cavanaugh murder is not well taken.

[3]This court is not bound by the Seventh Circuit's decision in *Espinoza*. See *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112, 368 N.E.2d 891 (because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive in State courts, except insofar as the decision of the lower Federal court may become the law of the case).

defendant further, and then took a written statement from him.

In addressing the defendant's fifth amendment claim, the *Martin* court focused on whether the defendant was properly advised of his fifth amendment right to counsel, and, if so, whether he knowingly and voluntarily waived this right. The defendant in *Martin* relied, in part, on *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, to support his claim that he did not knowingly and voluntarily waive his fifth amendment right to the presence of counsel while he was being custodially interrogated on the unrelated murder charge.

The Illinois Supreme Court declined to apply *Edwards* to the facts in *Martin*. The court noted that *Edwards* held that once a suspect invokes his right to counsel during custodial interrogation, he cannot be questioned further until counsel has been made available, unless the suspect himself initiates further dialogue. (*Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880.) However, the court determined that since the defendant in *Martin* did not invoke his right to counsel either in response to the *Miranda* warnings or at any time while he was being interrogated for murder, the *Edwards* rule did not apply. Further, the court noted that the defendant in *Martin* was advised of his *Miranda* rights prior to questioning, stated that he understood those rights, and proceeded to make oral and written statements without requesting an attorney or indicating that he wished to remain silent. Therefore, based on the facts and circumstances presented, the *Martin* court found that the defendant was properly advised of his fifth amendment right to counsel and that he knowingly and voluntarily waived this right.

The Illinois Supreme Court's decision in *People v. Hicks* (1989), 132 Ill. 2d 488, 548 N.E.2d 1042, *cert. denied* (1990), 495 U.S. 938, 109 L. Ed. 2d 515, 110 S. Ct. 2187, is consistent with *Martin*. In *Hicks*, the defendant made incriminating statements about his involvement in a burglary while a police officer was driving him to a correctional center several days after the court had appointed an attorney to represent the defendant at his arraignment on this charge. Hicks inculpated himself after the police officer had already advised Hicks that he could not talk to him about the case because an attorney had been appointed to represent him.

In addressing Hicks' fifth amendment claim, the Illinois Supreme Court determined that Hicks knowingly and intelligently waived his fifth amendment right to counsel. (*People v. Hicks*, 132 Ill. 2d at 495-96, 548 N.E.2d at 1045.) The court reached this result after noting that the police officer had advised Hicks of his *Miranda* rights on several occasions, and Hicks was sufficiently familiar with the criminal

justice system to realize that "he had the right to keep quiet until his attorney was present." 132 Ill. 2d at 493, 548 N.E.2d at 1044.

Further, the Supreme Court's recent decision in *Butler v. McKellar* (1990), 494 U.S. 407, 108 L. Ed. 2d 347, 110 S. Ct. 1212, is consistent with the approach taken by the Illinois Supreme Court in *Martin* and *Hicks*. In *Butler*, the defendant was arrested on assault and battery charges. The defendant retained counsel, who represented him at the bond hearing held on these charges. The defendant was later taken from jail to the police department for questioning about an unrelated murder. After receiving his *Miranda* warnings, the defendant indicated that he understood his rights and signed two written waivers. He did not request that his previously appointed attorney be called. The defendant confessed to the murder during this interrogation. At trial, he unsuccessfully sought to have this confession suppressed because it was obtained in violation of his fifth amendment right to counsel.

After the defendant was convicted of murder, he filed a petition for Federal *habeas* relief, which the district denied. The Fourth Circuit Court of Appeals affirmed. (*Butler v. Aiken* (4th Cir. 1988), 846 F.2d 255.) In addressing the defendant's fifth amendment claim, the Fourth Circuit noted that

> "a properly initiated interrogation on [an] entirely different charge[ ] [did] not intrude into an accused's previously invoked rights but [instead] offers [the] accused an opportunity to weigh his rights intelligently in light of changed circumstances. When, as occurred in this case, the accused then freely waives any constitutional right to counsel and provides voluntary statements of an incriminating nature, there is no justification for undermining the search for [the] truth by suppressing those statements." *Butler*, 846 F.2d at 259.

The Supreme Court affirmed the Fourth Circuit's decision that the defendant's confession was not obtained in violation of his fifth amendment right to counsel. *Butler v. McKellar* (1990), 494 U.S. 407, 108 L. Ed. 2d 347, 110 S. Ct. 1212.[4]

---

[4]In so doing, the Court did not actually address the merits of the defendant's fifth amendment claim. Rather, the Court declined to apply *Arizona v. Roberson* (which it decided on the same day the Fourth Circuit denied Butler's petition for rehearing) to *Butler* because *Roberson* announced a new rule which was inapplicable to cases on collateral review. (*Butler v. McKellar*, 494 U.S. at 415, 108 L. Ed. 2d at 357, 110 S. Ct. at 1218.) Further, the Court determined that the *Roberson* rule did not come within either of the exceptions under which a new rule is available on collateral review. *Butler v. McKellar*, 494 U.S. at 415, 108 L. Ed. 2d at 357, 110 S. Ct. at 1218.

In light of the Supreme Court's decision in *Butler v. McKellar*, we find that the reasoning employed by the Illinois Supreme Court in *People v. Martin* remains sound. *Martin* is therefore controlling on the case at bar. In fact, *Martin* and the instant case are, on their facts, virtually indistinguishable from one another. As was the case in *Martin*, defendant in the case at bar was initially arrested and taken into custody on charges unrelated to those on which he was later questioned. A public defender was appointed to represent both Martin and defendant in the instant case. As was also the case in *Martin*, defendant, while still in custody on the first charges, was given his *Miranda* rights when the police questioned him about the Cavanaugh murder. The defendant waived his *Miranda* rights and thereafter implicated himself in the Cavanaugh murder.

■ Our review of the instant record discloses that defendant's admissions regarding his role in the Cavanaugh murder were not obtained in violation of the fifth amendment because he was admonished under *Miranda* on two occasions. Significantly, defendant did not invoke his right to counsel after Assistant State's Attorney McNerney advised defendant of his *Miranda* rights or at any time during questioning. The record indicates that defendant understood the meaning and import of the *Miranda* rights and that he was aware of the nature of the questioning. Further, because defendant had requested and received counsel to represent him at the bond hearing on the armed robbery and aggravated battery charges, it is apparent that he was familiar with the role which an attorney would play during interrogation. Also, the record does not disclose that defendant asked the authorities to cease questioning at any point so that his previously appointed attorney could be summoned. Based on the foregoing evidence, we conclude that defendant knowingly, voluntarily, and intelligently waived his fifth amendment right to counsel when he was questioned about the Cavanaugh murder. See, *e.g.*, *People v. Pittman* (1973), 55 Ill. 2d 39, 52, 302 N.E.2d 7, 14; *People v. Brooks* (1972), 51 Ill. 2d 156, 164, 281 N.E.2d 326, 332 (when an individual has been admonished of his rights and indicates that he understands them, his giving of a statement without requesting a lawyer is some evidence that he has chosen to waive a known right); see also *People v. Jackson* (1990), 198 Ill. App. 3d 831, 844 (defendant waived his fifth amendment right to counsel when he was advised of his *Miranda* rights before being questioned on an unrelated offense and did not indicate that he was unable or unwilling to deal with police questioning without the aid of counsel).

## II

Next, defendant challenges two aspects of the trial court's rulings on the admissibility of certain evidence and testimony. First, defendant argues that the trial court improperly allowed Detective Costello to testify that he initially arrested defendant on charges of armed robbery and aggravated battery, and that, at the same time, he also served a warrant on defendant for another unrelated offense. Second, defendant alleges that the trial court improperly admitted into evidence, and allowed the jury to take back to the jury room, a copy of the order authorizing Detective Brownfield to pick up defendant from jail and transport him to Area Two Police Headquarters for questioning about the Cavanaugh murder. In response, the State maintains that the trial court properly admitted this evidence and testimony so that the jury could understand the steps taken in the investigation of the homicide which led to the defendant's arrest and the circumstances surrounding his confession to the Cavanaugh murder.

■■ ■ The trial court has the discretion to decide which evidence is admissible; this court will not reverse the trial court's decision unless it has abused its discretion. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 530, 453 N.E.2d 849, 857.) In deciding whether to admit evidence of an unrelated crime which defendant allegedly committed, the trial court must balance the relevancy of the evidence offered against its tendency to inflame or prejudice the jury. (*People v. Copeland* (1978), 66 Ill. App. 3d 556, 559, 384 N.E.2d 391, 394.) The evidence is inadmissible if it is offered merely to establish the defendant's propensity to commit crime. *People v. Stewart* (1984), 105 Ill. 2d 22, 60, 473 N.E.2d 840, *cert. denied* (1985), 471 U.S. 1131, 86 L. Ed. 2d 283, 105 S. Ct. 2666.

■■ Our review of the instant record indicates that the trial court did not abuse its discretion in allowing Detective Costello to testify that an unrelated burglary warrant was outstanding on defendant at the time he was arrested on the armed robbery and aggravated battery charges. Contrary to defendant's assertion, the record does not disclose that the State offered this evidence merely to establish the defendant's propensity to commit crime. Rather, Detective Costello's testimony was relevant to establish the steps that led to defendant's arrest, detention, and subsequent questioning on the instant charge. Further, this testimony was important because it set forth the chronology leading to defendant's confession to the instant offense on March 19, 1986, more than one month after he was initially arrested. If the jurors had not been informed that defendant was initially arrested on an unrelated offense, they might have been

left with the erroneous impression that defendant was arrested and jailed until he confessed to the instant offense. Because Detective Costello's testimony was relevant to establish the facts leading to defendant's confession to his involvement in the Cavanaugh murder, we conclude that the trial court properly admitted this testimony. See *People v. Guyon* (1983), 117 Ill. App. 3d 522, 453 N.E.2d 849 (informing the jury of the consequential steps in the investigation of a crime is necessary and important to the full explanation of the State's case); *People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167 (facts describing the State's investigation of a crime are properly received into evidence).

In a related argument, defendant also maintains that the trial court improperly admitted into evidence, and allowed the jury to take back to the jury room, the court order authorizing Detective Brownfield to transport defendant from Cook County jail to Area Two Police Headquarters for questioning on the instant offense. Defendant maintains that because the trial court sustained his objection, on relevancy grounds, to Detective Brownfield's testimony concerning this court order, there was no foundation for the admission of the order into evidence. Defendant therefore reasons that because a proper foundation was not laid for this court order, the trial court improperly admitted it into evidence.

In response the State acknowledges that defendant objected to Detective Brownfield's testimony about the court order on relevancy grounds, and that the trial court sustained several of these objections. However, the State points out that defendant did not object to the introduction of the court order into evidence because a proper foundation had not been laid. The State also notes that defendant did not raise this issue in his motion for a new trial. Accordingly, the State reasons, the defendant has waived this argument.

 We agree with the State's position on this issue. Our review of the record reveals that defendant objected, on relevancy grounds only, to Detective Brownfield's testimony about the court order. The record further discloses that although defendant objected to the trial court's decision to allow the jury to review the court order, defendant did not specifically object on the grounds that no proper foundation was laid for admission of this exhibit into evidence. Significantly, defendant did not challenge the trial court's ruling on the admissibility of Detective Brownfield's testimony or the trial court's decision to allow the jury to view the court's order in his motion for a new trial or in any other post-trial motion. We therefore conclude that defendant waived this argument. *People v. Enoch* (1988), 122 Ill. 2d 176, 522

N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274 (to properly preserve an issue for review, both a trial objection and a written post-trial motion raising the issue are required); *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183, *cert. denied* (1988), 484 U.S. 1079, 98 L. Ed. 2d 1022, 108 S. Ct. 1060 (the defendant's failure to object to an issue during trial or to raise it in a written post-trial motion specifying the grounds supporting the motion constitutes a waiver of that issue).

### III

Defendant also argues that the trial court denied his right to a fair trial when it summarily rejected the jury's request for a copy of the transcript of Lee Cavanaugh's testimony and refused the jury's request to define the word "abet." In response, the State maintains that defendant waived this argument because he failed to object at trial and failed to include the alleged error in a post-trial motion.

■ Our review of the record reveals that defendant did not object to the court's response to the jury's requests and did not raise this issue in his motion for a new trial. We therefore conclude that defendant waived this argument. See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

### IV

Defendant also argues that this court should remand this case so that the trial court can conduct a *Batson* hearing in order to determine whether the State improperly used its peremptory challenges to exclude blacks from the jury. Defendant points out that during *voir dire*, the prosecution improperly exercised its peremptory challenges to remove five black prospective jurors solely on the basis of their race. Defendant also maintains that the trial court applied the wrong standard in ruling on defendant's motion for mistrial based on the State's discriminatory use of its peremptory challenges. Specifically, defendant maintains that the trial court improperly relied on the "systematic exclusion" standard enunciated in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824, instead of the "purposeful discrimination" standard enunciated in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

In response, the State argues that the totality of the circumstances fails to show that the State exercised its peremptory challenges in a racially discriminatory manner.

■ The equal protection clause forbids a prosecutor from pe-

remptorily challenging potential jurors solely on account of race or on the assumption that black jurors as a group will be unable to impartially consider the prosecutor's case against a black defendant. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) A defendant alleging that the prosecution's exercise of a peremptory challenge was racially motivated has the burden of showing purposeful discrimination. *Batson*, 476 U.S. at 94, 90 L. Ed. 2d at 86, 106 S. Ct. at 1722; *People v. Young* (1988), 128 Ill. 2d 1, 538 N.E.2d 453.

 In order to establish a *prima facie* case of purposeful discrimination under *Batson*,

"the defendant first must show that he is a member of a cognizable group *** and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race [solely on the basis of their race]." *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.

 In the instant case, the trial court denied defendant's motion for a mistrial based on the State's discriminatory use of its peremptory challenges after finding no evidence of "systematic exclusion." While it is true that the "purposeful discrimination" standard enunciated in *Batson* has replaced the "systematic exclusion" standard set forth in *Swain*, we do not find that the trial court's reliance on the *Swain* standard constitutes reversible error. For reasons that we explain below, the State's use of its peremptory challenges did not demonstrate a discriminatory intent under either *Swain* or *Batson*.

In the case at bar, defendant, who is black, has demonstrated that the State exercised five of its six peremptory challenges to excuse black jurors. However, these factors do not establish a *prima facie* case of purposeful discrimination. Defendant must also establish that the State removed black venire persons solely because they were black.

 In determining whether the State improperly exercised its challenges solely on the basis of race, a court must look to the totality of the circumstances surrounding the jury selection. (*People v. Young* (1988), 128 Ill. 2d 1, 538 N.E.2d 453.) Our review of the record discloses that the *voir dire* consisted of two separate venires. 29 of the 62 jurors examined were removed for cause. Of the remaining 33 jurors, the prosecution exercised five of its six peremptory challenges to excuse blacks. However, the record also indicates that defense counsel also removed two prospective black jurors acceptable to the prosecution. Significantly, the resulting jury was composed of seven white and five black jurors. This factor indicates that blacks were pro-

portionately represented on the jury. Finally, we note that defendant, the victim, and all of the witnesses except the law enforcement personnel were black. Any racial issue inherent in the selection of the jury is therefore minimal. (*People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, *cert. denied* (1990), 490 U.S. 1113, 104 L. Ed. 2d 1036, 109 S. Ct. 3175 (in a case involving noninterracial crime, court noted that specific racial groups are not prone to take sides of prejudice).) After considering these circumstances, we conclude that defendant failed to establish that the State exercised its peremptory challenges in a racially discriminatory fashion.

## V

Next, defendant argues that this court should vacate his extended-term sentence because it was based on an unconstitutional provision of our Unified Code of Corrections, section 5—5—3.2(b)(2) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2)).

In pertinent part, section 5—5—3.2(b)(2) provides that a defendant can be sentenced to an extended-term sentence where the defendant was convicted of any felony and the court finds that the offense was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

Defendant, relying on the United States Supreme Court's decision in *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, challenges the constitutionality of this provision. Defendant contends that under *Maynard*, section 5—5—3.2(b)(2) is unconstitutionally vague.

In *Maynard*, the Supreme Court held that an Oklahoma criminal statute in which the death penalty was imposed if the murder was "especially heinous, atrocious, or cruel" was unconstitutionally vague under the eighth amendment because it failed to provide sufficient guidance to the sentencer. *Maynard*, 486 U.S. at 363-64, 100 L. Ed. 2d at 382, 108 S. Ct. at 1859.

The Illinois Supreme Court has recently considered the validity of a criminal code section cast in language nearly identical to that in section 5—5—3.2(b)(2). In *People v. Kidd* (1989), 129 Ill. 2d 432, 544 N.E.2d 704, and *People v. Odle* (1988), 128 Ill. 2d 111, 538 N.E.2d 428, the court addressed whether section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)) was constitutional.

In pertinent part, this provision allows the death penalty to be imposed where the victim's death "resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." In *Kidd* and *Odle*, the

court determined that section 9—1(b)(7) did not suffer from the same constitutional infirmity as did the statute in *Maynard* because the Illinois statute was much more specific. *People v. Kidd,* 129 Ill. 2d at 456, 544 N.E.2d at 714; *People v. Odle,* 128 Ill. 2d at 140, 538 N.E.2d at 428.

The court's decisions in *Kidd* and *Odle* control this case. Section 5—5—3.2(b)(2) specifically describes the conduct which qualifies an accused for an extended-term sentence. The conduct must not only be exceptionally brutal or heinous; it must also be such that it is indicative of wanton cruelty. Because this language is sufficiently specific, we reject defendant's contention that section 5—5—3.2(b)(2) of the Unified Code of Corrections is unconstitutional. See also *People v. Fyke* (1989), 190 Ill. App. 3d 713, 722, 546 N.E.2d 1101, 1108 (court held that language of section 5—5—3.2(b)(2) was "sufficiently indicative of the type of contact which warrants an extended-term sentence").

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McMORROW, P.J., and JIGANTI, J., concur.