THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH GANT, Defendant-Appellant.

First District (2nd Division)   No. 1—89—0669

Opinion filed August 4, 1992.—Rehearing denied September 10, 1992.

Michael J. Pelletier and James E. Chadd, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb and Michael Latz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

After a bench trial, defendant Joseph Gant was found guilty of murder, armed violence, home invasion, aggravated unlawful restraint, and possession of a stolen motor vehicle. Because the court found that the evidence of guilt was overwhelming, and that the offense was accompanied by extensive brutal or heinous behavior indicative of wanton cruelty, it sentenced defendant to the custody of the Illinois Department of Corrections for an extended term of 65 years for murder, 30 years for armed violence, 7 years for possession of a stolen motor vehicle and 5 years for aggravated unlawful restraint, all sentences to run concurrently. A timely notice of appeal was filed.

The State's evidence consisted mainly of defendant's statements made to the police and to various acquaintances, admitting that he planned and participated in all of the offenses with which he was charged, except that of murder. Bartholomew Veal, with whom he had attended high school, testified that defendant asked him on July 26, 1986, if he wanted to "make some money" by breaking into the home of Derrick Wilkinson and Regina Dunn. Defendant also asked Veal if he had a gun, and told him that he could make $3,000. Veal declined to get involved. After the crime had been committed, defendant and his codefendant Irving Ramey asked Veal if he would sell certain stolen items for them, but he refused. Veal also testified that in mid-October, defendant called him to say "he didn't know it was going to

happen like that, and that he regretted" the way things had turned out, namely that Ramey had killed Wilkinson. Gerald Jackson, another of defendant's acquaintances, testified that defendant had asked if he could borrow his handcuffs for the evening, and Jackson complied. He also identified the handcuffs which the police had retrieved from the crime scene as those that he had loaned to defendant.

Regina Dunn testified that on the night of July 31, 1986, she was awakened by a noise. While in her bed, someone jumped on her, pressed her head down, held a sharp object against her neck and said, "Don't move, else I will kill you." She then heard a second voice tell the first voice to shut up. The second voice also told her not to move or he'd kill her. One of the two voices told her "don't move or I will kill your kids." A pillow was placed over her face, thus making it impossible for her to identify visually either person; she was also handcuffed and tied to Wilkinson. During this incident, the only sound she heard from Wilkinson was his clearing his throat; she touched him but he said nothing.

After a few minutes, Dunn heard footsteps leave the bedroom and go downstairs; she then heard things being wheeled through the door downstairs.[1] She later heard someone come up the stairs, switch on the bedroom light, get on the bed, turn her over, and remove the chain from around her neck. When Dunn heard no other noises, she removed the pillow from her face and saw that Wilkinson was handcuffed to her; she also noticed that she had been cut on the neck and was bleeding. She eventually struggled to the window and called for help, and when the police arrived, they found her sitting on the bed and Wilkinson lying in a pool of blood. Wilkinson was found to have no vital signs. The autopsy report listed the cause of death as a stab wound to the chest.

Hazel Crest police detective Gary Jones testified that shortly after the incident, the two stolen vehicles were found approximately two or three blocks from defendant's girl friend's apartment and that he had found a wooden-handled steak knife inside one of the cars. Defendant was arrested on November 25, 1986, and after having been given his *Miranda* warnings he told the police that he, Ramey and an unidentified third person had broken into Dunn's residence. Defendant said he never went upstairs, and that his only role was to take the stereo and

---

[1]After Dunn had returned from the hospital, she reported missing three VCRs, a tape deck, two turntables, an amplifier, a set of speakers, a microwave oven, and two automobiles.

video equipment out to the cars; he wanted nothing to do with handcuffing and gagging any of the people in the house.

After making that statement, however, defendant told Jones that he had not told the whole truth and expressed a desire to make another statement concerning what had happened. In this second statement defendant said that he and Ramey planned to burglarize Dunn's apartment a few days prior to the incident and that there was no third person involved. On the night of the break-in, he called Jackson and arranged to pick up a pair of handcuffs from his mailbox. Once in the apartment they proceeded upstairs. He jumped on Dunn, turned her face to the wall, and ordered her to be quiet; Ramey jumped on Wilkinson. Defendant held Dunn until Ramey had handcuffed both her and Wilkinson. Defendant then went downstairs and started disconnecting the stereo equipment. When Ramey came downstairs sometime later, he had blood on his hands. Defendant stated that he had not known Ramey was carrying a knife or that Ramey had stabbed Wilkinson. The two men proceeded to load the electronic equipment into the two cars, checking periodically on Dunn and Wilkinson. This second statement was reduced to writing by Detective Jones and was signed by defendant. He also gave a statement to Assistant State's Attorney Maureen Harton, taken by a court reporter, the content of which was comparable to the second one given to the police. Defendant and Ramey were tried separately.

## I

In both his opening and closing statements, defense counsel admitted that defendant had committed the crimes of home invasion, armed violence, aggravated unlawful restraint, and possession of a stolen motor vehicle, but asked the court to find that his client was not accountable for Wilkinson's death. Counsel's theory of defense, as it was argued to the court, was that "Mr. Ramey, for reasons we will not know in this trial, undertook independent action, went upstairs for no apparent reason, because it was not in furtherance of the, if you want to call it, conspiracy or planned criminal conduct, which was to steal these items and sell them for money, for some reason [to] stab Mr. Wilkinson"—in sum, that Ramey committed an independent crime by killing Wilkinson.

After counsel had made the above-quoted opening remarks, the court had the following discussion with defendant and his counsel:

"THE COURT: I want to inquire of Mr. Rago [defense counsel], and I don't mean to interfere at all in any strategy deci-

sions or attorney-client situation, have you discussed the strategy of your case with Mr. Friel [co-counsel]?

MR. RAGO: Yes, Judge, over an extensive period of time, over the proposition [sic] of the trial, and more importantly last week as well as this form of indication to the form of the Court [sic] as well as the matters to which Mr. Gant wishes to address to the Court. Specifically again, this is without violation to attorney-client privileges, which is not to contest he in fact engaged in the actions which led to the home invasion and engaged in the actions of stealing not only the motor vehicles and the stereo equipment. Certainly he wished to contest before the Court any accountability for the killing of Mr. Wilkinson by Mr. Ramey.

THE COURT: Mr. Gant, is that correct? Have you discussed this with your attorney?

A. Yes, sir.

THE COURT: This is the strategy that you and your attorney have agreed upon, is that correct?

A. Yes, sir.

THE COURT: Fine."

Defendant argues that his counsel presented no meaningful defense, in that counsel essentially conceded his guilt by acquiescing to the charges; that counsel's strategy had no basis in law, and thus had no chance of success. For these reasons he claims a violation of his sixth amendment right to effective assistance of counsel, citing *People v. Chandler* (1989), 129 Ill. 2d 233. In *Chandler*, the defendant was convicted of murder, residential burglary and arson. According to his statement, the defendant ransacked the first floor of the home while the codefendant went upstairs. The codefendant came back downstairs, said there was a woman upstairs, and then returned to the second floor with a knife from the victim's kitchen. "According to defendant's statement, he then started to go upstairs and saw his codefendant come out of the victim's bedroom and heard him state that 'it's too late.'" (*Chandler*, 129 Ill. 2d at 237.) The defendant and codefendant took items from the house and left. They later returned to set fire to the house in order to destroy any fingerprints. *Chandler*, 129 Ill. 2d at 237.

At trial Chandler's counsel, in his opening statement, told the jury, " 'I can say I think candidly there's only really two people know [sic] what happened in the [victim's] house on the night of January 15th and the early morning hours of January the 16th and that's the defendant and his co-defendant.'" (*Chandler*, 129 Ill. 2d at 241.) In

his closing argument, defense counsel "while apparently conceding the fact that defendant entered the victim's house, argued that defendant did not stab the victim but that defendant's codefendant stabbed the victim, causing her death." (*Chandler*, 129 Ill. 2d at 239.) Counsel went on to argue, however, that " 'I don't think if you take a realistic view of this that you[, the jury,] can find defendant guilty of murder.' " (*Chandler*, 129 Ill. 2d at 239.) Based on this evidence, the court held that counsel's actions in conceding that the defendant committed the underlying felony constituted ineffective assistance of counsel, citing *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

In order to establish ineffective assistance under *Strickland*, the defendant must prove "(1) that his counsel's performance was deficient by having made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment, and (2) that his counsel's deficiencies prejudiced the defendant." *Chandler*, 129 Ill. 2d at 242, citing *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064, and *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.

The court in *Chandler* held that both prongs of *Strickland* had been met. First, the performance was deficient in that

"Counsel's apparent strategy was to convince the jury, in closing argument, to believe defendant's denial, in his statements to the police, of killing the victim. This strategy was the basis of counsel's deficiency. *** Defense counsel apparently mistakenly believed that the jury could find defendant not guilty of murder if they believed that he had not inflicted the fatal wounds to the victim. *** The jury, however, having been instructed on both felony murder and accountability, had no choice but to find defendant guilty of murder, residential burglary and arson.
***

This court has repeatedly held that, to be guilty of felony murder, a defendant need not be the one who inflicted the fatal wounds to the victim of the underlying felony. (See *People v. Hickman* (1974), 59 Ill. 2d 89; *People v. Smith* (1974), 56 Ill. 2d 328; *People v. Allen* (1974), 56 Ill. 2d 536.)" *Chandler*, 129 Ill. 2d at 246-47.

Second, the court concluded that "there [was] a reasonable probability that but for counsel's deficient performance, the result of the trial would have been different." (*Chandler*, 129 Ill. 2d at 250.) Apply-

ing *Chandler* to the facts in the case at bar, defendant argues that his counsel's strategy and actions amounted to no real defense at all and that his defense was virtually identical to the strategy adopted in *Chandler*.

We note, however, that the court in *Chandler* did not elaborate as to how or why the result would have been different, a circumstance pointed out by the dissent. No matter, for the result in this case is governed by *People v. Ganus* (1992), 148 Ill. 2d 466. The defendant in *Ganus*, serving time in the Menard Correctional Institution, was convicted of three counts of murder and sentenced to death for having murdered a fellow inmate. He appealed his convictions, claiming, in part, ineffective assistance of counsel. At trial, his counsel attempted to defend on the theory of compulsion, and relied on the defendant's involvement with gangs at Menard. Clearly, though, the defense of compulsion is not a defense available to one charged with an offense punishable by death. *People v. Gleckler* (1980), 82 Ill. 2d 145; Ill. Rev. Stat. 1987, ch. 38, par. 7−11(a).

In analyzing the defendant's claim, the court applied the *Strickland* standard and held that the defendant had failed to prove ineffectiveness. The record in *Ganus* demonstrated that the defendant had provided police with a detailed, "Mirandized" confession, but that he refused to testify at trial on his own behalf. The record demonstrated also that counsel had consulted with legal experts in an effort to formulate and finalize his strategy, *to which the defendant consented.* (*Ganus*, 148 Ill. 2d at 471-72.) The court found that

> "[i]n terms of defense strategy, the gang-activity evidence was legitimate, even though defendant was not entitled to a compulsion defense. ***
>
> Regardless of defense counsel's intentions regarding compulsion, this evidence was relevant as mitigation, and its use as such was defense counsel's principle reason for eliciting it. Counsel's chosen concentration was the prevention of defendant's death—a legitimate strategy given the unique circumstances of this case. [Therefore, these actions] cannot be characterized as unreasonable under the first prong of the *Strickland* standard." *Ganus*, 148 Ill. 2d at 472.

Turning, then, to the second prong of the *Strickland* analysis, the court noted that the record was

> "replete with evidence corroborating defendant's confession. ***
>
> *** [D]efendant's conviction was the result of a highly corroborated confession, rather than inflammatory gang evidence.

Given the strong nature of the evidence, it cannot be said that the jury would likely have acquitted defendant had defense counsel not established [his gang affiliation]." (*Ganus*, 148 Ill. 2d at 473.)

The court stressed heavily that the case before them was one in which the defendant

"literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. *** A weak or insufficient defense does not indicate ineffectiveness of counsel in a case where a defendant had no defense. In this case it would appear that defense counsel used his imagination and resourcefulness to come up with something where he had nothing to go on." *Ganus*, 148 Ill. 2d at 473-74.

Here, too, defense counsel's overall performance demonstrated competent representation. He presented, pursued, and preserved zealously a pretrial motion to quash defendant's arrest; he took advantage of all of his opportunities to make appropriate objections during the State's direct examination of its witnesses; and he vigorously cross-examined Veal and Dunn. He pointed out what he thought to be weaknesses in the State's position and attempted to develop a theory of innocence, albeit a totally hopeless one, on the basis that Ramey committed an independent crime, and here, as did Ganus, defendant clearly consented to his attorney's strategy. Defendant's counsel could not have argued that defendant was not guilty of home invasion, armed violence, aggravated unlawful restraint, and possession of a stolen motor vehicle, without risking the loss of credibility with the trier of fact on other issues. (*People v. Johnson* (1989), 128 Ill. 2d 253, 269; *Chandler*, 129 Ill. 2d at 257 (Ryan, J., dissenting).) However impractical his independent crime theory as a defense, defendant's acknowledgment that he participated in the other crimes but not in Wilkinson's stabbing of the victim could have been relevant as mitigation. (*Ganus*, 148 Ill. 2d at 472.) Indeed, we note in the record that defendant used his "independent crime" theory as mitigation at sentencing. As in *Ganus*, "[d]efense counsel finalized a strategy and obtained defendant's consent to same" (*Ganus*, 148 Ill. 2d at 472); and "once the decision to stand trial has been made, counsel must put the prosecution to its burden of proving defendant guilty beyond a reasonable doubt." (*Chandler*, 129 Ill. 2d at 245.) In the case at bar, the prosecution was put to that burden; moreover, his counsel did not concede any fact to which defendant did not admit to the police. (*Chandler*, 129 Ill. 2d at 245.) Thus, for the same reasons as in

*Ganus*, defense counsel here cannot be said to have violated the first prong of *Strickland*.

Similarly, because of the overwhelming evidence against defendant, his counsel cannot be said to have violated the second prong of *Strickland*: Defendant had provided police with a voluntary, written, and signed "Mirandized" confession; and he had provided one subsequently to an assistant State's Attorney. Veal, one of defendant's friends from high school days, testified that defendant had admitted to having broken into Dunn's home and stolen goods therefrom, but that Ramey's conduct was not consonant with their plan. In addition, the handcuffs which were removed from Wilkinson were identified as those which were borrowed from Jackson. Lastly, the two stolen vehicles were recovered a few blocks away from defendant's girl friend's apartment. Thus, following the more recent pronouncement of the supreme court in *Ganus*, as we must, we are led irresistibly to the conclusion that defendant's ineffective assistance claim is untenable.

## II

Defendant also argues that the record does not show that he "intelligently and knowingly" agreed to plead guilty, as required by *Boykin v. Alabama* (1969), 395 U.S. 238, 243-44, 23 L. Ed. 2d 274, 279-80, 89 S. Ct. 1709, 1712-13, and *People v. Hattery* (1985), 109 Ill. 2d 449, 464, *cert. denied* (1986), 478 U.S. 1013, 92 L. Ed. 2d 727, 106 S. Ct. 3314, since knowing and intelligent consent "will not be presumed from a silent record." (*Hattery*, 109 Ill. 2d at 464.) Defendant claims that before he could intelligently and knowingly consent to his counsel's strategy, it would be critical for the record to reflect his understanding of the consequences attendant upon his conceding that he committed the underlying felonies, and that he could not have knowingly and intelligently agreed to his counsel's trial strategy if he did not understand that the doctrines of felony murder and accountability made inevitable a murder conviction once his counsel had admitted upon his behalf that he had committed the companion offenses.

■ We disagree. Defendant entered a formal plea of not guilty and never withdrew this plea. Accordingly, the trial court proceeded to conduct a trial at which defendant "[held] the prosecution to its heavy burden of proof beyond a reasonable doubt." (*United States v. Cronic* (1984), 466 U.S. 648, 656 n.19, 80 L. Ed. 2d 657, 666 n.19, 104 S. Ct. 2039, 2045 n.19.) This was not the situation that we find to exist in *People v. Horton* (1991), 143 Ill. 2d 11, in which the State was relieved of its duty to prove beyond a reasonable doubt the elements of the charges brought against the defendant.

In *Horton* the defendant was charged in a 10-count indictment, and in two separate *stipulated bench trials* was convicted of five of those counts. In his first trial, the defense counsel in his closing argument stated that he was "not contesting the evidence to convict," and preserved for appeal the previously denied motion to quash arrest and suppress the lineup. In his second trial, however, he stipulated both to the evidence and to its sufficiency "to convict [defendant of the offenses] as charged," that is, he "stipulate[d] to the legal conclusion to be drawn from the evidence." (*Horton*, 143 Ill. 2d at 21.) The supreme court concluded that while the defendant's first trial was not tantamount to a guilty plea, his second trial was. Unlike *Horton*, however, defendant here did not stipulate to the facts or to the sufficiency of the evidence against him; rather, he held the State to its burden of proof (*Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039). Were defendant's consent to his counsel's strategy tantamount to a formal admission of guilt, the State would have been relieved of that burden.

Nor is ours the situation which was found to exist in *Hattery*. The supreme court in *Ganus* found "some similarities" between that case and *Hattery*, where the

> "defendant had pled not guilty to a murder charge. His counsel's trial strategy consisted of admitting that the defendant was guilty of murder but was not deserving of the death penalty. Defendant did not consent to that trial strategy. In [*Ganus*], on the other hand, defendant's counsel's trial strategy was consented to by defendant. What [*Ganus*] presents is a situation where the defendant literally had no defense. Evidence of his guilt was overwhelming. His counsel conceived a compulsion defense which, though not a legal defense, could or might have persuaded a jury not to convict. Jury nullification is always a possibility." (*Ganus*, 148 Ill. 2d at 473.)

In light of *Ganus*, we can confidently conclude that defendant knowingly and intelligently consented to his counsel's strategy, a consent clearly spread on the face of the record made in this case. Thus, defendant's argument on this issue must be rejected.

### III

■ In objecting to the trial court's sentencing him to an extended term, defendant contends that in light of *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev.

Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2))[2] is unconstitutionally vague.

The State, however, cites Illinois authority, distinguishing *Maynard*, which holds that section 5—5—3.2(b)(2) is constitutional. In *People v. La Pointe*, the court defined the word "heinous" as "hatefully or shockingly evil" or "grossly bad," and the term "brutal" as conduct which is "devoid of mercy or compassion," or "cruel or cold-blooded." (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501.) In *People v. Bryant* (1990), 202 Ill. App. 3d 290, *appeal denied* (1990), 135 Ill. 2d 559, *cert. denied* (1991), 502 U.S. 824, 116 L. Ed. 2d 61, 112 S. Ct. 89, the court held that section 5—5—3.2(b)(2) "specifically describes the conduct which qualifies an accused for an extended-term sentence." Therefore, this section does "not suffer from the same constitutional infirmity as did the statute in *Maynard* because the Illinois Statute [is] much more specific." (*Bryant*, 202 Ill. App. 3d at 309. See also *People v. Barnhill* (1989), 188 Ill. App. 3d 299, 309, *appeal denied* (1990), 129 Ill. 2d 566 (interpreting section 5—8—1(a)(1)(b), "these words are sufficiently indicative of the type of murder which warrants a sentence of natural life imprisonment and are not unconstitutionally vague on their face"); *People v. Fyke* (1989), 190 Ill. App. 3d 713, 722 (applying the rule in *Barnhill* to section 5—5—3.2(b)(2)); *People v. Page* (1990), 193 Ill. App. 3d 467, 472, *appeal denied* (1990), 131 Ill. 2d 564 ("Section 5—5—3.2(b)(2) is not unconstitutionally vague in nondeath penalty cases").) Accordingly, we find that section 5—5—3.2(b)(2) of the Unified Code of Corrections is not unconstitutionally vague.

### IV

■ Finally, defendant contends that the evidence in this case fails to establish excessive brutal or heinous behavior indicative of wanton cruelty. At sentencing, it was determined that defendant had two prior juvenile adjudications for battery for which he received one year of probation and six months of supervision. Based on all the evidence,

---

[2]Section 5—5—3.2(b)(2) reads as follows:

> "the following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:
>
> ***
>
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty" Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(b)(2).

the trial court in the case *sub judice* held that defendant's actions were accompanied by "extensive [*sic*] brutal or heinous behavior indicative of wanton cruelty." The court based its determination on evidence that defendant had planned and committed a home invasion to take place at night, knowing that people were present there, sleeping; because he "bound, gagged, and handcuffed" Dunn and Wilkinson; because he knew of the potential for violence involved in a home invasion; and because he made "threats to kill either the individual he bound or the children of that individual." Furthermore, defendant "left one victim bound and gagged to [*sic*] a gasping pool of blood."

Defendant cites *People v. Lucas* (1989), 132 Ill. 2d 399, and *People v. Andrews* (1989), 132 Ill. 2d 451, as cases in which the supreme court reversed the trial court, holding that the conduct there was not so exceptionally brutal or heinous as to justify the imposition of a more severe sentence. He also cites *People v. Bedony* (1988), 173 Ill. App. 3d 613, *People v. Price* (1987), 158 Ill. App. 3d 921, and *People v. Holiday* (1985), 130 Ill. App. 3d 753.

It is within the trial court's discretion to determine what constitutes "exceptionally brutal and heinous behavior indicative of wanton cruelty" for the purpose of imposing an extended sentence. (*People v. Edens* (1988), 174 Ill. App. 3d 1033, 1045, *appeal denied* (1989), 124 Ill. 2d 558.) Moreover, extended-term sentences for brutal and heinous conduct may apply to accomplices as well as principals. *People v. Jordan* (1984), 103 Ill. 2d 192, 215.

We hold that the trial court did not abuse its discretion and find that the cases which defendant cites are distinguishable.

For the above-stated reasons, we affirm the judgment of the trial court.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.