THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY HARTZOL, Defendant-Appellant.

First District (5th Division)   No. 1—88—0947

Opinion filed November 27, 1991.

Randolph N. Stone, Public Defender, of Chicago (Thomas N. Swital, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Sharon Jefferson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GORDON delivered the opinion of the court:

A jury found defendant, Anthony Hartzol, guilty of murder, armed robbery, aggravated criminal sexual assault and home invasion. The court sentenced defendant to a term of natural life imprisonment for murder; a consecutive, extended term of 60 years for aggravated criminal sexual assault; a concurrent term of 30 years for home invasion; and a concurrent term of 30 years for armed robbery.

On appeal, defendant contends that the trial court erred in denying his motion to suppress lineup identification evidence because the photo array and lineup were unnecessarily suggestive and that the court erred in refusing to give the jury an instruction on accountability for murder. In regard to sentencing, defendant contends that he was deprived of his due process rights when the court relied on hearsay reports concerning defendant's misconduct while he was incarcerated prior to trial; that the court improperly considered certain aggravating factors because it erroneously believed defendant was eligible for the death penalty; that it was improper to impose consecutive sentences for murder and aggravated criminal sexual assault because they were part of a single course of conduct; that a natural life imprisonment term was improper because defendant's conduct was not exceptionally brutal or heinous; that the Illinois penalty statutes for murder violate due process and equal protection by permitting either natural life or extended terms for exceptionally brutal and heinous crimes; that the natural life sentence was grossly disparate to the 60-

year sentence received by a codefendant; and that a natural life sentence without possibility of parole violates the eighth and fourteenth amendments.

On September 24, 1984, at about 2 a.m., defendant and an accomplice, Samuel Marzette (who was tried separately), broke into the home of 34-year-old Lavelle Sherman, 36-year-old Linda T., and their three children, 13-year-old Daniel, 5-year-old Diedra, and 6-month-old Derrick, and demanded money and drugs. During the incident, which lasted from 10 to 20 minutes, Lavelle was shot and killed.

MOTION TO SUPPRESS

Prior to trial, defendant filed a motion to suppress the identifications made by photo array and by physical lineup.

Detective Wilson F. Watson of the Harvey police department testified that defendant was arrested for the crimes in question on September 26, 1984. At 9:45 a.m., a photo array which included defendant, Marzette and five other men was shown to 13-year-old Daniel, who identified defendant and Marzette. At 10:45 p.m., Daniel and his mother, Linda, separately viewed a physical lineup. Both of them identified defendant as the man who shot Lavelle. Defendant was the only person included in both the photo array and the lineup, and was the only person wearing braids.

The court granted defendant's motion to bar reference to the photo array because the police department was unable to produce the photos at the time of the hearing. The court denied defendant's motion to bar reference to the identifications made at the physical lineup.

TRIAL

At trial, Linda testified that on Sunday, September 24, 1984, she lived in Harvey, Illinois, with Lavelle Sherman and their three children. She had lived with Lavelle for about 14 years. At the time, they lived in a three-room house, including a kitchen which led to a "middle bedroom," which led to a "back bedroom." The rooms did not have doors, and there was a straight line of sight from the back bedroom to the kitchen. A bare light bulb was always on in the kitchen and in the middle bedroom.

On September 24, 1984, Linda and the children arrived home from her mother's at about 1:30 a.m. Lavelle was asleep in bed in the back bedroom. At 2 a.m., Linda and the three children had just gone to bed, also in the back bedroom, when Daniel woke up Lavelle and said that he heard someone at the back door. Lavelle and Daniel got

up and walked toward the kitchen. The "door burst open and two men fell into the kitchen." The men were later identified as defendant and Marzette. Lavelle quickly shoved Daniel and Diedra under a pile of clothes in the back bedroom. Linda was sitting on the bed holding the baby.

Marzette held a sawed-off shotgun. The men "began to beat [Lavelle] and ask him for money" and drugs. Linda saw defendant hit and push Lavelle. It "looked like [Marzette] hit [Lavelle] with the end of the gun, the butt of the gun." Lavelle said they had no money. "Then they pushed him down to the floor and made him lay down face down on the floor in the middle bedroom." They continued to beat Lavelle and demand money and drugs. At one point, defendant took Lavelle's wallet out of his back pocket while Lavelle was face-down on the floor and Marzette was holding the shotgun.

Defendant then went into the back bedroom, grabbed Linda, and pulled her into the middle bedroom. He pushed her down on one of the twin beds in the middle bedroom. She held the baby under her arm. Marzette was standing in the corner of the middle bedroom "with the shotgun over" Lavelle. Defendant stood between Linda's legs, behind her, with his knee on Linda's back. He was choking her, pushing her face into the mattress. Linda testified, "I had Derrick sort of on the side of me where he wouldn't get smothered. I was trying to keep him up under me but he was—he was on the side of me." She continued: "[Defendant] pulled my pants down and then he pulled them back up again. And he pulled them down again and put his hand inside" her vagina. He kept demanding money or drugs. Linda said they had none. He slapped Linda.

"After that he grabbed Derrick by his feet and pulled him out from under me." Defendant "held Derrick up by his heels toward the guy standing in the corner and said, 'Man, shoot this m--- f--- baby.'" Linda, leaning on her side and looking up from the bed, begged defendant not to hurt the baby. Linda testified:

"A. Then he threw the baby across the room toward the other bed on the other side against the wall. He threw him against the wall.

Q. And did you see him throw Derrick?

A. Yes, I did.

Q. And what happened to Derrick?

A. Derrick hit the wall and fell into the bed.

* * *

Q. What happened after that?

A. Then he forced me back down on the bed and put his knee like in my back and his right hand on my neck *** and held me down."

After that, Linda felt defendant "lean away from me [and] I heard footsteps and movement." Then she heard a shot. There was "a couple of seconds" between the time she felt defendant's knee come off her back and the time she heard the shot.

"Q. What did you see?

A. I saw him standing there with his shotgun in his hand. *** Smoke was coming out of it.

Q. Did you see the other individual [Marzette] anywhere in the room?

A. No I didn't.

Q. How long was it between the time you heard the shot and you saw [defendant] holding the gun?

A. Couple of seconds."

Defendant then ran out of the house. Linda saw Daniel "standing in the doorway of the back bedroom looking at [Lavelle]." Two days later, Linda identified defendant in a lineup.

Linda testified on cross-examination: "I didn't see the trigger pulled. I saw the man who shot [Lavelle], though. The same man that had his knee in my back. The same man that threw my baby across the room. The same man who put his hand in me was standing there with a smoking shotgun." The entire incident lasted 15 to 20 minutes.

Linda remembered later talking to Detective Watson. She denied telling Watson that the "taller man" assaulted her or the baby. She did tell Watson that the "taller subject" was 6 feet 1 inch to 6 feet 2 inches tall, thin to medium build, early 20's, medium complexion, wearing khaki pants. She described the "shorter man" as 5 feet 7 inches tall. He wore a black and white checked shirt, jacket, dark pants. She told Watson the shorter man had dark bumps on his face; was a few inches taller than Lavelle, but a little heavier; he had braided hair. She denied giving any different description to Watson. The photograph of the lineup showed defendant with his hair braided differently. "It wasn't parted and braided down the side like this [on September 24]. It was braided going straight back."

On cross-examination, apparently in an attempt to impeach Linda's credibility, defense counsel inquired about Linda's drug use and sale of drugs, and prior convictions.

Seventeen-year-old Daniel T., Linda's son, testified that on September 24, 1984, he was 13 years old. When he heard a loud noise at the door, he woke up Lavelle, his father. He followed his father to the

middle bedroom, when "[t]wo men come stumbling in the door." Defendant entered first. Marzette held a shotgun. Lavelle "grabbed me and pushed me in the room, told me to get on the floor. *** He grabbed a pile of clothes and threw them on me, me and my sister."

Daniel heard Lavelle arguing in the other room with the two men. The men demanded money and "shit" and Lavelle "said he didn't know what they was talking about. *** I heard, you know, smacking indicating like fighting and stuff."

Defendant then came into the back bedroom. He "[felt] around, looking for a light switch or something." Defendant then grabbed Linda and "dragged her out of the room." Daniel was "laying besides the bed, *** peeking around the corner," watching.

Daniel moved "up closer to the door," telling Diedra to remain hidden. Daniel remained crouched down, looking into the middle bedroom. He saw his father's "feet laying across the doorway" to the middle bedroom. "I looked—I was trying to look around the corner, and then I seen one of the men standing in the corner." It was Marzette. He was "[j]ust standing there," over Lavelle. The "arguing and cussing" continued.

Daniel "moved back for a second," and then he "heard moving in the [middle] bedroom." It was "[l]ike shifting, people were shifting around. *** Then I moved back, back in the same spot that I was. *** I didn't see the man standing in the corner no more." He had not seen Marzette move.

Daniel then heard someone say, "Man, kill this [m--- f---] baby." Daniel "tried to get closer to the door."

"A. Then I heard—then I seen a shadow up against the wall, I seen my father getting up."

Q. And, did you see your father's legs then?

A. No.

Q. When did you see your father's shadow trying to get up? Before or after you heard, 'Shoot the baby.'

A. Right after.

Q. And, what happened then?

A. He got up, and then I heard a gun shot."

On cross-examination, Daniel testified similarly:

Q. How soon after you heard ['kill the baby'] did you hear the gunshot?

A. About almost like instantly, it was.

Q. Just right after that?

A. Right after.

Q. You heard somebody say, kill the baby, you saw your father start to move, and the gun went off?

A. Yes.

* * *

Q. Are you telling us now that you were in the room when the gun went off?

A. No.

Q. You were outside the room?

A. I was just making it to the door."

Daniel saw his "father hit the wall, and fall to the floor." At that moment, Daniel stepped in the doorway. "I saw that man standing there with the shotgun pointed at my father." Defendant "had [the gun] in both of his hands. One hand on the barrel, and one hand on the trigger."

"Q. And, what did you—did you notice anything about the shotgun?

A. Smoke was coming from it.

Q. What did you do then?

A. I went down and towards Lavelle.

Q. Was that man still in the room?

A. Yes.

Q. What happened then?

A. He turned around, walked and then he ran out the door."

Several days later, Daniel identified defendant in a lineup which was held on the night of September 26, 1984.

Daniel denied telling Detective Watson that the "taller man" assaulted his mother or threatened his baby brother, and denied telling Watson any additional facts about what the men did to his parents. Daniel agreed that he told Watson the taller man was 6 feet 0 inches to 6 feet 2 inches, thin to medium build and that the shorter man was 5 feet 7 inches tall. He told Watson the shorter man had light-colored eyes, looked as if he were the same height and weight as Lavelle, but more muscular. He told Watson that the shorter man had his hair "rolled up or something." It was "braided, rolled up." The braids went straight back the top of his head. He did not have a mustache. Daniel denied giving Watson any other description.

James Harris, a neighbor, testified that on September 24, 1984, he lived next door to Linda and Lavelle. His bedroom window is about five or six feet away from their house.

At 2 a.m., he was in bed when he heard a loud knocking and some voices at Lavelle's back door. Two male voices were saying, "This is a

raid. Open the door." From the tone of the voice, he believed it "sounded like a violent-type matter and I figured it wasn't no police officers talking like that." He then heard "another noise which seemed like a force of entry." Harris testified further:

"Then I heard a voice in the home say, 'Bitch, give me the money. Where is the money?' They they said, 'I will kill this baby.' From there she screamed, started crying. *** The woman was saying, 'no, don't shoot my baby. Don't shoot my baby. I don't have anything.' Then I heard one of them say, 'Don't move, punk.' I don't know, it wasn't too much longer after that I heard a gunshot."

It was 30 seconds to a minute between the time he heard "kill this baby" and the gunshot. Harris' wife telephoned the police. Harris then heard footsteps going out of Lavelle's house. Soon after, he saw Linda come out of the house "hollering and screaming." The entire incident lasted 10 to 15 minutes.

Detective Watson testified that on September 24, 1984, he investigated the shooting. Lavelle died at 3:28 a.m. at the hospital. He spoke with Daniel for 20 or 30 minutes at the scene. Daniel was "really upset." Later, at the police station, he spoke with Linda, who was "real shaken" and "[c]rying, really unable to speak with much clarity." When he spoke with Linda at 5:30 she was emotional, depressed, he could not always understand what she was telling him; she was crying; distraught; not calm or composed.

On cross-examination, Watson testified that when he spoke with Daniel at 3:30 a.m., Daniel described the two men. The descriptions were consistent with Daniel's testimony, although adding more detail. The police photograph taken of defendant on September 26, 1984 showed his hair in french braids or corn rolls, and with "some growth on his upper lip."

On September 24 at 5:30 a.m., Watson spoke with Linda. Watson's notes and report reflected some confusion as to when Linda was referring to defendant, and when she was referring to Marzette. (Watson's 13-page report was dictated from his notes five or six weeks after the murder.) Watson testified that Linda actually described a "big man and a thin man." Watson testified: "[T]he wording tall and short [in his report] were basically the words that I chose to use as my interpretation." Linda only distinguished the two men by "big and thinner." Watson replaced "big" with "taller." He did not use the word "bigger" in his report. Linda did not use the term "taller."

Thus, in the report, he did not write out verbatim what Linda said. "I would more or less print in my own words what she said."

For example, Watson was asked whether Linda told him that the tall man sexually assaulted her. Watson replied: "She advised me the triggerman," and he wrote it down in his report as the "tall man."

"In my report, I basically went taller and thinner, and in some instances in the report, the description that she offered did not coincide as I began to learn now with [sic] what she meant."

Watson testified that the "tall" man, whom he presumed was Marzette, was described by Linda as being 6 feet 1 inch or 6 feet 2 inches tall; thin to medium build; early 20's; medium complexion; wearing khaki pants with a wool black and white plaid jacket. The shorter man, whom Watson presumed was defendant, was 5 feet 7 inches tall; medium complexion; wearing a short jacket; with dark bumps on his face. She said nothing about a mustache, or his hair being in french braids or corn rolls. Watson did not recall asking Linda about the hair of the two men.

Watson's report states that Linda said it was the "taller man" who had the shotgun; gave the shotgun to the shorter man; threw Linda on the bed; pulled the baby from her and threw the baby; put his hands into her vagina; and told defendant to kill the baby.

It was the "shorter man" who came into the back bedroom, grabbed Linda, started to beat her, and brought her to the middle bedroom. Linda told Watson that as she reached up for the baby, she saw Lavelle try to get up, she heard a gun go off; then the taller man released her and ran towards door.

Watson described the police investigation leading to defendant's arrest about 4:30 p.m. on September 26, 1984. That night, at about 11 p.m., Linda and Daniel identified defendant in a lineup. The only person in the lineup with corn rolls was defendant.

Dr. Edmund Donoghue, a medical examiner, testified that Lavelle was 34 years old; 131 pounds; 5 feet 2 inches tall. Lavelle died from a shotgun wound involving the right lung, the heart, the liver and the kidney. There were also some abrasions or lacerations. In addition, Lavelle had needle track scars on his left arm. They were at least three months old. There were also two bullets in Lavelle's leg. They were unconnected to his death, and had been there a minimum of three months.

Yolanda Paulette (Brooks) Clark testified for the State that in September 1984 she was 17 years old and had known defendant for about four months. On September 23, 1984, Clark was in the bedroom with defendant and Clark's one-year-old son when Sam Marzette came to the door at 1 a.m. Defendant came back into the bedroom and took a loaded sawed-off shotgun out of the dresser drawer. Mar-

zette had given defendant the shotgun for his birthday several days earlier. Defendant then left with Marzette.

Clark further testified that defendant returned 2½ hours later, sweating and breathing hard. "He was real shaky and real panicky ***." Defendant reported "that he had just killed a man." Butch Hasan had picked up Marzette and told Marzette to pick up defendant. "They were going to a house where the lady kept money in her vagina." They drove in Hasan's car with two other men. They went "to a drug house." Defendant told Clark that someone had kicked in the door, and Marzette and defendant entered the house. Marzette was carrying the shotgun.

Marzette then "passed the shotgun back to [defendant], and [Marzette] went for the lady." Marzette put the lady on a table, held her down, and put his hand in her vagina to "try to find the money." She continued: "There was a baby. [Marzette] was holding a baby in the air. He told [defendant] to shoot it."

Similar to the testimony of Linda and Daniel, Clark testified that defendant reported that a "man came toward him, and [defendant] shot him in the chest."

Clark also testified that she knew where defendant was hiding while the police were looking for him. The police told her she had been harboring a fugitive and that if she lied before the grand jury it would be perjury, and that, for those reasons, the welfare agency could take her child from her.

Clark conceded that after testifying before the grand jury, where her testimony was "substantially similar" to her testimony at trial, she wrote a letter to defendant on December 10, 1984, indicating that he was not guilty. But she testified that what she told him in the letter was not the truth.

Darryl Andrew Neal, a Harvey police officer, testified for defendant that he responded to the call regarding a shooting on September 24, 1984. He spoke with Linda and Daniel. They did not report that defendant had braids or a mustache. He spoke with Daniel for about 15 seconds. Daniel "may have been in shock." He spoke with Linda for three to five minutes. She was "pretty hysterical and rather incoherent." He observed drug paraphernalia in the house.

Sheree Ann Hartzol, defendant's sister, testified for the defense that on September 20, 1984, several days before the murder, defendant's hair was in french braids, "a hair style most young men are wearing." He had worn a mustache for several years.

The jury found defendant guilty of murder, armed robbery, aggravated criminal sexual assault and home invasion, but that defendant was not eligible for the death penalty.

After considering evidence in mitigation, and in aggravation, including disciplinary reports regarding defendant's misconduct while in prison, the court sentenced defendant to natural life imprisonment with no possibility of parole for murder; a 60-year consecutive term for aggravated criminal sexual assault; a 30-year concurrent term for armed robbery; and a 30-year concurrent term for home invasion.

OPINION

Defendant first contends that the trial court erred in denying his motion to suppress because the pretrial photo array and lineup were unnecessarily suggestive.

Evidence of pretrial identifications of an accused by a witness must be excluded at trial only where (1) the procedure was unnecessarily suggestive and (2) there was a substantial likelihood of misidentification. (*People v. Sykes* (1987), 161 Ill. App. 3d 623, 633, 515 N.E.2d 253.) Defendant bears the burden of establishing that the pretrial confrontation was unduly suggestive, and courts look to the totality of the surrounding circumstances in reaching their conclusion. *People v. Sykes*, 161 Ill. App. 3d 623, 515 N.E.2d 253.

The State incorrectly argues that defendant waived the issue by not including the photographs in the record on appeal. It is well established that is is not necessary to produce the photographs in order to prove or disprove suggestiveness. *People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1; *People v. Lark* (1984), 127 Ill. App. 3d 927, 933, 469 N.E.2d 728; *People v. Thompson* (1981), 93 Ill. App. 3d 995, 1006, 418 N.E.2d 112; *People v. Dallas* (1980), 85 Ill. App. 3d 153, 172, 405 N.E.2d 1202.

Defendant maintains that the lineup was tainted for three reasons. First, he was the only person in the lineup with braids; second, he was the only person in both the photo array and the lineup; and third, the use of a photo array while he was in custody further tainted the lineup.

■ With respect to defendant's contention concerning his distinct hair style, there is no requirement that all of the men in the lineup be physically identical. (*People v. Moore* (1977), 50 Ill. App. 3d 952, 957, 365 N.E.2d 1356.) "[T]he fact that a defendant is the only participant in the lineup with braided hair does not render it impermissibly suggestive where defendant is not forced to wear his hair in braids and there are no other significant physical or racial differences among the

participants." (*People v. Washington* (1989), 182 Ill. App. 3d 168, 175, 537 N.E.2d 1354, citing *People v. Trass* (1985), 136 Ill. App. 3d 455, 463, 483 N.E.2d 567; see also *People v. Tucker* (1969), 118 Ill. App. 2d 136, 255 N.E.2d 31 (lineup not improperly suggestive where defendant the only man in lineup with red hair).) There is even less significance in defendant's wearing braids in view of the testimony of both Linda and Daniel that the braids worn by defendant during the incident on September 24, 1984, were not the same as the braids he wore during the lineup two days later, *i.e.*, they were vertical instead of going straight back.

In regard to defendant's argument that he was the only person who was in both the photo array and the lineup, this court has held that identification procedures are not invalidated where defendant is the only person whose photograph was previously shown to the person viewing the lineup. *People v. Thompson*, 93 Ill. App. 3d at 1007 (subsequent lineup identification is not impermissibly suggestive because defendant was only person in lineup whose photograph had previously been shown to witness); *People v. Moore*, 50 Ill. App. 3d at 957 (same); *People v. Witted* (1979), 79 Ill. App. 3d 156, 163, 398 N.E.2d 68 (same); (*People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644 (same); *People v. Jackson* (1973), 12 Ill. App. 3d 789, 793, 299 N.E.2d 142 (same).

Defendant argues further that the use of the photo array tainted the subsequent lineup procedure for the reason that he was already in custody when the police showed Daniel the photo array. See *People v. Williams* (1975), 60 Ill. 2d 1, 9, 322 N.E.2d 819 (" 'photographic identification procedures ought not to be employed when the suspect is in custody and a lineup is otherwise feasible' [citation] unless the police can offer extenuating circumstances justifying the use of photographic identification"). *Cf. People v. Brown*, 52 Ill. 2d at 100, (mere use of photographic identification procedure while defendant is in custody is not *per se* impermissible); *People v. Goka* (1983), 119 Ill. App. 3d 1024, 1027, 458 N.E.2d 26 ("Photographic identifications conducted while a defendant is in custody do not taint subsequent lineup identifications where the photos were not so impermissibly suggestive as to give rise to the substantial likelihood of irreparable misidentification"); *People v. Barnes* (1983), 117 Ill. App. 3d 965, 453 N.E.2d 1371; *People v. Wells* (1982), 106 Ill. App. 3d 1077, 436 N.E.2d 688; *People v. Lutz* (1982), 103 Ill. App. 3d 976, 431 N.E.2d 753; *People v. Thompson*, 93 Ill. App. 3d at 1006; *People v. Witted*, 79 Ill. App. 3d at 161-62.

The State did not respond to this argument in its brief. It appears that only Daniel viewed the photo array. The record clearly establishes that defendant was *not* in custody when Daniel was shown the photo array. At the pretrial hearing on the motion to suppress, Watson testified that defendant had not yet been arrested when the photo array was shown:

> "Q. The photographic displays or arrays that [defense] counsel [has] asked you about they took place before [defendant] was arrested; isn't that correct?
>
> A. That is correct."

Watson agreed at the pretrial hearing on the motion to suppress that Daniel was shown the photo array on September 26 at about "quarter to 10:00 in the morning." The photo array was put together "prior to charging" defendant. Defendant was not arrested until after 4:30 p.m. that day. The physical lineup which Daniel and Linda viewed was not held until 10:45 p.m. that night. Watson testified at the pretrial hearing that the lineup was at "about quarter to 11:00," which presumably meant 10:45 *p.m.*, since he testified at trial that the lineup was at 10 or 11 *p.m.*, following defendant's arrest that afternoon. Daniel also testified that the lineup was held at nighttime.

In any event, any possible error would have been harmless where the photo array was not essential to the lineup identification or the in-court identification of defendant. The record reveals that both Linda and Daniel made positive identifications of defendant. They separately identified defendant both in the lineup and at trial. They both had ample opportunity to observe defendant during the incident, which lasted for 10 to 20 minutes and took place in a well-lighted room. Linda testified she watched defendant holding her baby before he threw the baby. Linda and Daniel both watched defendant as he stood, holding the shotgun, after he shot Lavelle. Thus, the totality of circumstances indicates that the lineup identification and in-court identification were reliable since, in considering the relevant factors, the witnesses had a good opportunity to view defendant, their degree of attention was good, their certainty was high, and the time elapsed between the commission of the crime and the identification of defendant was only two days. (See *People v. Manion* (1977), 67 Ill. 2d 564, 571, 367 N.E.2d 1313; *People v. Lark*, 127 Ill. App. 3d at 934.) In addition, any weaknesses in the identification prior to trial, such as the witnesses' failure to mention defendant's braided hair, as well as any suggestiveness in the lineup were brought to the jury's attention and were resolved against defendant. *People v. Lark*, 127 Ill. App. 3d at 934; *People v.*

*Hefner* (1979), 70 Ill. App. 3d 693, 694-95, 388 N.E.2d 1059; *People v. Rosenborgh* (1974), 21 Ill. App. 3d 676, 684, 315 N.E.2d 545.

In addition, Clark's testimony strongly corroborated the identification testimony of Linda and Daniel. We conclude that the pretrial identification procedures here were not unfairly suggestive and, even if tainted, the resultant error would have been harmless.

Defendant next contends that there was some evidence to show that Marzette was the shooter, and therefore, the trial court erred in denying defendant's request to submit accountability jury instructions on murder.

Defendant objected to the court's ruling, but failed to *specifically* raise the issue in his post-trial motion for a new trial. (*People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Solis* (1991), 216 Ill. App. 3d 11, 576 N.E.2d 120; *People v. Stewart* (1987), 161 Ill. App. 3d 99, 514 N.E.2d 51; *People v. McClure* (1979), 80 Ill. App. 3d 10, 16-17, 398 N.E.2d 1233.) Thus, the issue has necessarily been waived for purposes of appeal. *People v. Young* (1989), 128 Ill. 2d 1, 39, 538 N.E.2d 453; *People v. Lark*, 127 Ill. App. 3d at 932; *People v. Goka*, 119 Ill. App. 3d at 1027.

■ Notwithstanding the waiver of this issue, we note that there is some conflict in the testimony of the witnesses as to whether it was defendant or Marzette who sexually assaulted Linda and who threatened to kill and who then threw the baby. However, there is no conflict in the witnesses' testimony that defendant was the shooter.

Two witnesses literally saw defendant holding the otherwise metaphorical "smoking gun." Linda testified that she felt defendant's knee come off her back, she heard footsteps and movement, and then she heard a shot. She turned from the bed and saw defendant standing over Lavelle with a shotgun in his hand, and smoke coming out of the shotgun.

Daniel testified that he heard the shot and saw his "father hit the wall and fall to the floor." At that moment, Daniel stepped in the doorway. "I saw that man standing there with the shotgun pointed at my father." Defendant "had [the gun] in both of his hands. One hand on the barrel, and one hand on the trigger." There was smoke coming out of the shotgun.

Yolanda Clark testified that defendant left with the loaded shotgun and returned several hours later, stating "that he had just killed a man." Defendant described the incident to Clark, stating that a "man came toward him, and [defendant] shot him in the chest."

Detective Watson testified that Linda told him that as she reached up for the baby, she saw Lavelle try to get up from the floor, and she

heard the gun go off. The taller man then released her and ran towards door. Even under this scenario, defendant had to be the shooter because Marzette, "the taller man," was holding down Linda.

Thus, the testimony of Linda, Daniel, Watson and Clark clearly establishes that defendant was the principal in the murder. (*People v. Lusietto* (1976), 41 Ill. App. 3d 205, 208, 353 N.E.2d 385; *People v. Umphers* (1971), 133 Ill. App. 2d 853, 858, 272 N.E.2d 278.) The accountability instruction for murder was properly refused.

Defendant next contends that the trial court improperly considered reports of defendant's misconduct while incarcerated when the court sentenced him.

Defendant objected at the sentencing hearing, but did not raise the issue in his post-trial motion. Thus, the issue has been waived for purposes of appeal. *People v. Young*, 128 Ill. 2d at 39; *People v. Lark*, 127 Ill. App. 3d at 932; *People v. Goka*, 119 Ill. App. 3d at 1027.

Moreover, in determining a sentence a court is not bound by the usual rules of evidence but may search anywhere within reasonable bounds for facts which tend to aggravate or mitigate the offense. (*People v. Thomas* (1981), 96 Ill. App. 3d 443, 455-56, 421 N.E.2d 357.) In sentencing a defendant, a " 'judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496, 431 N.E.2d 344, quoting *Roberts v. United States* (1980), 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362.) " '[M]ost of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination.' " (*La Pointe*, 88 Ill. 2d at 497, quoting *Williams v. New York* (1949), 337 U.S. 241, 246-51, 93 L. Ed. 1337, 1342-44, 69 S. Ct. 1079, 1083-85.) The court must take care to insure the accuracy of the information considered. (*People v. Adkins* (1968), 41 Ill. 2d 297, 300-01, 242 N.E.2d 258; *People v. Thomas*, 96 Ill. App. 3d 443, 421 N.E.2d 357.) It can use the information to inquire in the general moral character of the offender, his mentality, his habits, his social environments, his abnormal tendencies, his age, his natural inclination or aversion to commit crime and the stimuli which motivated his conduct. *People v. Adkins*, 41 Ill. 2d 297, 242 N.E.2d 258; *People v. Thomas*, 96 Ill. App. 3d 443, 421 N.E.2d 357.

Here, the court reviewed certified records from the Cook County and the Illinois Departments of Corrections, received by the State pursuant to a subpoena. The documents included in the record on ap-

peal are "Disciplinary Reports and Findings of Fact" from the Cook County Department of Corrections and are regarding incidents occurring between November 1, 1985, and September 24, 1986. The court also referred to documents, apparently from the State of Illinois Department of Corrections. In regard to these reports, the trial court commented: "I noticed that one of the reports from the Illinois Department of Corrections, several of them about wearing his colors, about recruiting somebody else for a gang; I believe it was called the Vice Lords. And some of the conduct the defendant perpetrated or engaged in, participated in necessitated various lockdowns." The court overruled defendant's objections to the admissibility of these documents.

■ The evidence of defendant's misconduct in jail is a proper subject of inquiry and may be relevant as an aggravating factor and may aid the court's determination of defendant's propensity toward violence and his rehabilitation potential. *People v. Stewart* (1984), 105 Ill. 2d 22, 68, 473 N.E.2d 840 (evidence properly admitted at sentencing hearing regarding defendant's conduct while in jail awaiting trial, as it reflected on the character of the defendant; defendant kicked one officer, called other officers names, and threw excrement on cell walls and at a jailer; photographs of his cell and of the jailer were introduced into evidence). See also *People v. Free* (1983), 94 Ill. 2d 378, 422, 447 N.E.2d 218; *People v. La Pointe*, 88 Ill. 2d at 494-99.

Hearsay testimony is not *per se* deemed to be inadmissible at a sentencing hearing as denying a defendant's right to confront witnesses. *People v. Hall* (1986), 114 Ill. 2d 376, 416-17, 499 N.E.2d 1335, 1352 (court rejects defendant's complaint that he was denied the opportunity to confront witnesses against him at sentencing hearing; trial court properly allowed to consider hearsay testimony of a correctional officer regarding defendant's being involved in a stabbing and other violence while in prison), citing *People v. Perez* (1985), 108 Ill. 2d 70, 86, 483 N.E.2d 250 (corrections officer testified at sentencing hearing that his superior told him to be careful around defendant because an inmate informed the superior officer that defendant had threatened to harm the witness; hearsay testimony relevant as aggravating factor because it tended to establish that defendant was a threat to the safety of others, and was reliable because it was corroborated by the witness' testimony that defendant had also directly threatened him); *People v. Brisbon* (1985), 106 Ill. 2d 342, 365, 478 N.E.2d 402 (hearsay testimony that defendant was charged in earlier murder, where charge was dismissed for want of probable cause, ad-

missible at sentencing hearing as relevant to defendant's unprosecuted misconduct).

The court here did not err in considering the prison reports of defendant's conduct in jail.

Defendant contends that the trial court erroneously believed he was eligible for the death penalty, despite the fact that the jury found otherwise. Defendant maintains that the "trial judge disregarded the jury's finding of fact" as to whether he was eligible for the death penalty when the court stated:

> "Now, the court has looked at the statutory factors. Having found the defendant guilty as the perpetrator of the offense of murder, and the jury verdict having found the defendant guilty of three other felonies committed during the course of that, or incidental to the murder, the court is aware that those factors, statutory factors should normally be found in Phase 1 of the sentencing hearing do in fact exist in this case, the statutory factors.

> And therefore the court needs to look at the evidence at the sentencing hearing that I conducted yesterday to listen to the aggravation, and mitigation, and the defendant's statements, and all of the matters that are germane, and relevant for the purposes of sentencing. This court has done that."

Defendant failed to raise this issue in his post-trial motion and failed to object at the sentencing hearing. Thus, the issue is waived for purposes of appeal. *People v. Young*, 128 Ill. 2d at 39; *People v. Lark*, 127 Ill. App. 3d at 932; *People v. Goka*, 119 Ill. App. 3d at 1027.

■ Moreover, we have reviewed the record and find no error on this issue. The jury found defendant was not eligible for the death penalty because one or more of the statutory aggravating factors did not exist. The jury's determination did not constitute a "finding of fact," as defendant would have us hold.

The same argument was made in *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 592, 444 N.E.2d 662, where the court held that the jury, in concluding at the end of a death penalty sentencing hearing that it could not unanimously find an aggravating factor present so as to qualify defendant for the death penalty, "did not affirmatively find that the aggravating factor did not exist. *** [I]t simply was unable to make an express finding either way on the factual question." Similarly, the jury determination here merely read as follows:

"We, the jury, cannot unanimously find beyond a reasonable doubt that the defendant, Anthony Hartzol, is eligible for a death sentence under the law.

We cannot unanimously find beyond a reasonable doubt that the defendant was 18 years or older at the time of the murder for which he was convicted in this case,

Or we cannot unanimously find beyond a reasonable doubt that the statutory aggravating factors exist."

No error occurred. Compare *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 456 N.E.2d 250 (where the trial judge himself was unable to determine whether it was defendant who actually killed the victim).

Defendant contends that the trial court improperly sentenced defendant to consecutive sentences of life imprisonment for murder and 60 years for aggravated criminal sexual assault because they "were part of a single course of conduct connected by [defendant's] convictions for armed robbery and home invasion. It is clear from the testimony of the State's witnesses that the 2 offenders came into the house with the intent of robbing the victims, and that the act, which formed the basis of the aggravated sexual assault conviction, was perpetrated while the offender was searching Linda *** for money or drugs." Defendant asserts that there was no substantial change in the nature of the criminal objective, and that the consecutive sentences were not required to protect the public.

Under section 5—8—4 of the Unified Code of Corrections, consecutive sentences may be imposed where the offenses were not part of a single course of conduct and such a term is required to protect the public:

"(a) *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury *** in which event the court shall enter sentences to run consecutively. ***

(b) The court shall not impose a consecutive sentence except as provided for in subsection (a) unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—4(a), (b).

It is within the trial court's discretion to determine whether a consecutive sentence should be imposed, and that judgment shall not be reversed on review absent an abuse of discretion. *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103; *People v. Singleton* (1984), 103 Ill. 2d 339, 469 N.E.2d 200; *People v. Peebles* (1984), 125 Ill. App. 3d 213, 465 N.E.2d 539.

■ Defendant here was found guilty of a Class X felony, murder, and inflicted severe bodily harm upon Lavelle. Thus, the court could properly impose consecutive sentences. *People v. Biesiada* (1990), 201 Ill. App. 3d 39, 558 N.E.2d 520 (consecutive sentence proper where defendant was convicted of three Class X felonies and caused severe bodily harm); *People v. Buford* (1988), 178 Ill. App. 3d 329, 338, 533 N.E.2d 472 (consecutive sentencing under section 5—8—4(a) was proper where defendant was convicted of armed robbery, a Class X felony, and he inflicted severe bodily injury by shooting the victim in the head; whether defendant's criminal objective remained unchanged or all acts constituted a single course of conduct was not relevant). See also *People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352 (court finds that since it determined that defendant was properly sentenced to extended term based on classification factor, it need not address his argument concerning the brutal or heinous nature of the offense).

Furthermore, the court was not precluded from imposing consecutive sentences here because the offenses were not "committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a). See, *e.g., People ex rel. Evans v. Twomey* (1972), 52 Ill. 2d 299, 287 N.E.2d 661 (consecutive sentences for attempted burglary and murder proper where acts performed were not similar); *People v. Rinaldi* (1989), 179 Ill. App. 3d 539, 534 N.E.2d 515 (multiple sentences proper where multiple victims); *People v. Gharst* (1984), 122 Ill. App. 3d 1, 460 N.E.2d 813 (consecutive sentences for armed violence and home invasion proper where acts performed were not similar).

In addition, the court considered the seriousness of the offenses and defendant's rehabilitative potential in imposing the consecutive sentences. It found that defendant possessed no potential for rehabilitation. The court stated:

> "[T]his court recognizes that this defendant, in my opinion, possesses no potential whatever for rehabilitation. That he's a threat to society. *** It's reached a point where with his kind of conduct a man, and his wife, and children are not safe in

their own homes. Their home can be invaded as part of the drug subculture. And if there's resistance, they can be gunned down with a sawed-off shotgun ***.

*  *  *

This defendant is not fit to be on the streets of our community. He isn't even capable of conforming his conduct to acceptable standards in a penitentiary environment."

Therefore the court did not abuse its discretion in imposing consecutive sentences here. See *People v. Epps* (1986), 143 Ill. App. 3d 636, 493 N.E.2d 378 (court properly imposed consecutive 60-year extended-term sentence and life sentence where court found it was necessary to protect the public from further criminal activity by defendant); see also *People v. Terrell* (1989), 132 Ill. 2d 178, 547 N.E.2d 145; *People v. Freeman* (1989), 182 Ill. App. 3d 731, 538 N.E.2d 681; *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362.

Defendant next contends that his natural life sentence should be reduced because his conduct did not constitute exceptionally brutal or heinous behavior indicative of wanton cruelty.

A trial court may impose a natural life sentence for first degree murder where the "court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b).

The imposition of a sentence rests within the trial court's discretion and will not be reduced by the appellate court absent an abuse of discretion. *People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.

In evaluating the brutality and heinousness of the crime, the "entire spectrum of facts surrounding the given incident must be analyzed and evaluated." (*People v. McGee* (1984), 121 Ill. App. 3d 1086, 1089, 460 N.E.2d 843; *People v. Strait* (1983), 116 Ill. App. 3d 110, 115, 451 N.E.2d 631.) The brutal and heinous behavior is determined, not by defendant's state of mind, but rather by the nature of the offense. *People v. Winston* (1989), 191 Ill. App. 3d 948, 548 N.E.2d 406; *People v. Thomas* (1988), 168 Ill. App. 3d 113, 522 N.E.2d 253.

Exceptionally brutal or heinous behavior indicative of wanton cruelty does not require "torture or unnecessary pain." (*People v. La Pointe*, 88 Ill. 2d at 501.) "Heinous" has been defined as "hatefully or shockingly evil[,] grossly bad[,] enormously and flagrantly criminal"; and "brutal" has been defined as "grossly ruthless[,] devoid of mercy or compassion[,] cruel and cold-blooded." *People v. La Pointe*, 88 Ill. 2d at 501.

"Cruelty" has been further defined as a "disposition to inflict pain or suffering or to enjoy its being inflicted." *People v. Jones*

(1979), 73 Ill. App. 3d 99, 103, 391 N.E.2d 767, *People v. Clark* (1981), 102 Ill. App. 3d 414, 424, 429 N.E.2d 1255.

In determining whether conduct is exceptionally brutal or heinous, the court may not consider those acts which simply exemplify, without more, the legal elements of the offense for which the defendant was convicted and instead must look for additional aggravating factors. See, *e.g., People v. Davis* (1984), 121 Ill. App. 3d 916, 460 N.E.2d 471 (court holds that imposition of extended sentence was improper, and that trial court improperly classified offense as heinous and brutal solely on the basis of defendant's intent to kill the victim, intent being a legal element of the offense of attempted murder, and court noted absence of any other aggravating factors in that victim was shot with .22 caliber handgun, sustained two minor wounds which were treated with pain medication).

The courts have properly considered various factors indicating the conduct was exceptionally brutal and heinous, including premeditation (*People v. La Pointe*, 88 Ill. 2d 482, 431 N.E.2d 344; *People v. McGee*, 121 Ill. App. 3d 1086, 463 N.E.2d 843); unprovoked nature of the attack (*People v. McGee*, 121 Ill. App. 3d 1086, 463 N.E.2d 843); number of wounds inflicted (*People v. Devine* (1981), 98 Ill. App. 3d 914, 424 N.E.2d 823); "needless additional intrusions on the physical integrity of the victim" during a robbery (*People v. Piontkowski* (1979), 77 Ill. App. 3d 994, 997, 397 N.E.2d 36); the "senseless" nature of the act (*People v. McGee*, 121 Ill. App. 3d 1086, 463 N.E.2d 843); the danger created by defendant's action, such as defendant's indifference to potential harm to other people around which could be caused by a shotgun blast (*People v. Hunter* (1981), 101 Ill. App. 3d 692, 428 N.E.2d 666; *People v. McGee*, 121 Ill. App. 3d 1086, 463 N.E.2d 843); shooting a second victim after he had accomplished his goal of getting money or drugs (*People v. Epps*, 143 Ill. App. 3d 636, 493 N.E.2d 378); the extent of the injury inflicted (*People v. Davis* (1984), 121 Ill. App. 3d 916, 460 N.E.2d 471); use of a series of actions to terrorize and endanger the victim (*People v. Viens* (1982), 109 Ill. App. 3d 1017, 441 N.E.2d 660); and shooting the victim with a shotgun at close range (*People v. Buford*, 178 Ill. App. 3d at 340; *People v. McGee*, 121 Ill. App. 3d 1086, 463 N.E.2d 843). A single act which causes death or injury may also be sufficient to demonstrate exceptionally brutal or heinous behavior, considering "the entire conduct of the defendant." *People v. McGee*, 121 Ill. App. 3d at 1091.

The court may also consider the mental anguish inflicted on the victims (*People v. Jones* (1987), 161 Ill. App. 3d 688, 515 N.E.2d 166; *People v. Jones* (1979), 73 Ill. App. 3d 99, 391 N.E.2d 767), and the

mental anguish inflicted on the family of the victims (*People v. Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810).

In a case similar to the case at bar, *People v. Clark* (1981), 102 Ill. App. 3d 414, 429 N.E.2d 1255, an extended sentence was upheld on the basis that the trial court could properly find defendant's conduct to be exceptionally brutal and heinous where defendant awakened a family at 3 a.m., held a gun to the head of an infant and told the victims to "do what I say or else," sexually assaulted the wife, tied up the husband, and robbed the family. The incident lasted 40 minutes. We held that in determining whether conduct is exceptionally brutal and heinous, courts could "consider either actual physical injury, mental suffering or both." (*Clark*, 102 Ill. App. 3d at 425.) The court could therefore consider the "possibility of injury and the mental anguish of the victims who feared for their lives" and the terror of "those with close emotional ties to the victim," such as when parents are forced to watch their infant being threatened with death. *Clark*, 102 Ill. App. 3d at 425.

In *People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929, the court found defendants' conduct exceptionally brutal and heinous where they invaded a family's home, aware that a woman had a family and thus was "an easy mark." When the victim began screaming, the father "in an effort to protect his family, attempted to bar the men from entering," and one defendant fired the shotgun, killing the couple's 10-year-old daughter. The court focused on "the premeditated plan to commit this robbery; the agreement of the participants to use one of the most deadly weapons available to effectuate it; their knowledge that young children lived in the apartment and that the victims would be surprised, unarmed, and defenseless; [and] the terror to which the family was subjected in standing helplessly against an unexplained invasion of their home and in seeing their 10-year-old daughter shot by an unprovoked shotgun blast." *People v. Clay*, 124 Ill. App. 3d at 157, 463 N.E.2d at 942. See also *People v. Edens* (1988), 174 Ill. App. 3d 1033, 529 N.E.2d 617 (conduct was exceptionally brutal and heinous where defendants planned a robbery, invaded a home in the middle of the afternoon, brutally shot victims who had in no way antagonized the perpetrators, and terrorized another victim).

Here, defendant invaded the home of Lavelle Sherman and his family, who were strangers to defendant, at 2 a.m., armed with a loaded shotgun; beat Lavelle and Linda and sexually assaulted Linda in front of their children; held a six-month-old infant by the feet, yelling "Man, shoot this m--- f--- baby" in front of the infant's parents and two siblings; threw the baby across the room, causing him to

strike the wall; and senselessly shot and killed a defenseless, unarmed victim in front of his family when he tried to protect his infant son from being shot. The trial court did not abuse its discretion in finding this behavior exceptionally brutal and heinous conduct indicative of wanton cruelty.

We note that, at trial, the defense brought out testimony regarding Linda's and Lavelle's involvement in the use and sale of drugs, and the fact that Lavelle's body showed signs of old gunshot wounds. This would not make the crimes any less brutal or heinous under the facts here, where three children were present, the victims were strangers to defendant and Marzette, and the victims were unarmed and helpless.

Defendant's reliance on *People v. Lucas* (1989), 132 Ill. 2d 399, 548 N.E.2d 1003, and *People v. Andrews* (1989), 132 Ill. 2d 451, 548 N.E.2d 1025, is misplaced. In *Lucas*, the court reversed the trial court's finding sentencing defendant to death on the basis that the death of defendant's seven-month-old son resulted from defendant's exceptionally brutal or heinous behavior. The supreme court found the defendant's conduct not to be exceptionally brutal and heinous where defendant, who was intoxicated, went into the bedroom of the infant, shook him, banging his head on the side of the crib, and killed the child. An autopsy showed the child died of suffocation, suffered a fractured left arm and a ruptured liver. The court stated that there was testimony that the injuries could have been inflicted by a single blow and that nothing indicated the death was premeditated, prolonged or torturous. (*People v. Lucas*, 132 Ill. 2d at 446.) In contrast, the present case involved premeditated conduct and acts designed to terrorize a family in order to force the parents to produce the money and drugs demanded by defendant and Marzette.

In *Andrews*, the court reversed the trial court's imposition of an extended-term sentence. The supreme court found that defendant's conduct was not exceptionally brutal and heinous. Defendant and another man got into a car stopped at a traffic signal, demanded money, shot the man in the head and took $7 from the woman. The supreme court focused on defendant's expression of remorse, which the trial judge had accepted as sincere, defendant's lack of a prior history of violent crimes, and the absence of evidence indicating defendant planned on shooting the victim prior to the crime. (*People v. Andrews*, 132 Ill. 2d at 466.) Unlike the present case, *Andrews* did not involve extraneous acts of brutality such as threatening an infant and throwing him against a wall in order to force the victims to comply with

demands for money, or sexually assaulting a mother and shooting a father in front of their children.

Defendant next contends that certain Illinois sentencing provisions violate his rights to due process and equal protection. The "exceptionally brutal or heinous behavior" factor may be used to impose either an extended-term sentence or a term of natural life. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3(b)(2), 1005—8—1(a)(1), 1005—8—2(a)(1).) Defendant argues: "[T]here is no distinction between the type of exceptionally brutal or heinous conduct for which the conviction must be returned. This sentencing scheme unconstitutionally fails to provide meaningful criteria for determining which of those defendants convicted of an exceptionally brutal or heinous murder should receive a natural life sentence and which should receive an extended term sentence."

In a related argument, defendant contends that the " 'living death' sentence without the possibility of parole is a violation of both the Federal and Illinois Constitution[s]," particularly the eighth and fourteenth amendments.

■ These arguments were not made before the trial court either during sentencing or in a post-trial motion, and thus they have been waived for purposes of review. See *People v. Wade* (1989), 185 Ill. App. 3d 898, 903, 542 N.E.2d 58; *People v. Cartalino*, 111 Ill. App. 3d at 591.

Moreover, Illinois courts have repeatedly upheld these statutes against identical or similar constitutional attacks. See, *e.g., People v. Taylor* (1984), 102 Ill. 2d 201, 206, 464 N.E.2d 1059, 1062; *People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 336, 518 N.E.2d 1047, 1050; *People v. Hernandez* (1990), 204 Ill. App. 3d 732, 562 N.E.2d 219; *People v. Bryant* (1990), 202 Ill. App. 3d 290, 559 N.E.2d 930; *People v. Gant* (1990), 202 Ill. App. 3d 218, 227-28, 559 N.E.2d 923; *People v. Brown* (1990), 195 Ill. App. 3d 78, 551 N.E.2d 1100; *People v. Barnhill* (1989), 188 Ill. App. 3d 299, 543 N.E.2d 1374; *People v. Wade* (1989), 185 Ill. App. 3d 898, 903, 542 N.E.2d 58; *People v. Whitlock* (1988), 174 Ill. App. 3d 749, 528 N.E.2d 1371; *People v. Cartalino*, 111 Ill. App. 3d 578, 444 N.E.2d 662.

Defendant contends that his sentence of natural life imprisonment for murder was disparate to Marzette's sentence of 60 years, because their rehabilitation potential was similar, and the nature and extent of their participation in the crime were similar. He argues that Marzette was the "planner" or "leader" because he came to defendant "in the middle of the night and coaxed [defendant] into coming out with him" and Marzette held the shotgun when they entered Lavelle's home. In

addition, Marzette had a criminal record for robbery. Defendant argues that, in contrast, defendant had "three prior convictions" which were "not indicative of a long life of crime," and there was "no history of violence in the defendant's background, except [for] the aggravated battery conviction." His two other convictions were for burglary and theft. Thus, he argues, his "background does not mandate such a more severe sentence." He also points out that he had a high school degree, was working, and had a "family type" relationship with Yolanda Clark when the incident occurred.

A disparity in sentences between codefendants will not be disturbed where it is warranted by differences in the nature and extent of their participation in the offense, by differences in the criminal records, or by one defendant's greater rehabilitative potential. (*People v. Godinez* (1982), 91 Ill. 2d 47, 55, 434 N.E.2d 1121.) On review, the court must give great weight to the judgment of the sentencing court. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882; *People v. Paino*, 137 Ill. App. 3d at 652.

Marzette had one 1980 conviction for robbery, and a 1985 conviction for possession of a stolen vehicle. He received probation for both offenses. He also had a 1985 conviction for robbery, for which he received a three-year prison sentence. Defendant had a 1981 conviction for theft, for which he received three years' probation, terminated in June 1982. In June 1982, he was convicted of aggravated battery, burglary and theft, and sentenced to four years' imprisonment. He was paroled on June 1, 1984, and committed the present offense only three months later. Thus, there was little difference in the criminal records of the two men.

■ In the present case, however, the evidence established that defendant was the shooter, as discussed above. For purposes of sentencing, the trial judge may reweigh for himself the evidence presented to the jury at trial so long as his determination is not inconsistent with the jury's verdict. To that end, the judge may choose between conflicting trial evidence and assess for himself the relative credibility of the witnesses. (*People v. O'Neal* (1988), 125 Ill. 2d 291, 531 N.E.2d 366; *People v. McGee*, 121 Ill. App. 3d at 1090.) This is true all the more with respect to evidence presented for the first time at the sentencing hearing. In either case, we should defer to the trial court's assessments of credibility and its evaluation of the sentencing evidence since the trial judge's opportunity to consider factors in aggravation and mitigation is superior to that afforded by the cold record in this court. *People v. Perruquet*, 68 Ill. 2d at 154; *People v. Suane* (1987), 164 Ill. App. 3d 997, 518 N.E.2d 458.

The trial judge, who presided over both defendant's and Marzette's separate trials, did not abuse his discretion in imposing a greater sentence on defendant than on Marzette.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

MURRAY and McNULTY, JJ., concur.